```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF TEXAS
                      CORPUS CHRISTI DIVISION




FIMBANK PLC,                     )      CASE NO:  2:19-CV-00264
                                 )
              Plaintiff,         )            CIVIL
                                 )
     vs.                         )       Corpus Christi, Texas
                                 )
DISCOVER INVESTMENT CORP,        )  Wednesday, November 13, 2019
ET AL,                           )
                                 )   (2:47 p.m. to 4:17 p.m.)
              Defendants.        )   (4:32 p.m. to 4:57 p.m.)
_____


                           HEARING

          BEFORE THE HONORABLE B. JANICE ELLINGTON,
               UNITED STATES MAGISTRATE JUDGE




APPEARANCES:              See page 2


Court Reporter:          Recorded; FTR

Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988
```

**Proceedings recorded by electronic sound recording; transcript produced by transcription service.**

2

**APPEARANCES:**


For Plaintiff:                ANDREW R. NASH, ESQ.
                              Phelps Dunbar
                              500 Dallas, Suite 1300
                              Houston, TX 77002

                              EDWARD W. FLOYD, ESQ.
                              Floyd Zadkovich
                              215 Park Ave. South, 11th Floor
                              New York, NY 10003

                              ANDREW NASH, ESQ.
                              Phelps Dunbar
                              500 Dallas St., Suite 1300
                              Houston, TX 77002

For Defendants:               JAMES F. BUCHANAN, ESQ.
                              Welder Leshin
                              800 N. Shoreline Blvd.
                              Suite 300 North Tower
                              Corpus Christi, TX 78401

                              MICHAEL J. WRAY, ESQ.
                              CHRISTOPHER R. HART, ESQ.
                              Holman Fenwick Willan
                              5151 San Felipe, Suite 400
                              Houston, TX 77056

3

1      **Corpus Christi, Texas; Wednesday, November 13, 2019; 2:47 p.m.**

2                          **(Call to Order)**

3              **THE COURT:**  All right, good afternoon.  I'm going to

4      call Case Number C-19-cv-264; FIMBank PLC versus Discover

5      Investment Corporation et al.

6              May I have appearances, please?

7              **MR. FLOYD:**  Good afternoon, your Honor.  Edward

8      Floyd, from the Floyd Zadkovich firm, for the Plaintiff.

9              And with me --

10             **MR. NASH:**  Andrew Nash, from Phelps Dunbar, for the

11     Plaintiff.

12             **THE COURT:**  I'm sorry.  You're Andrew --

13             **MR. NASH:**  Nash.

14             **THE COURT:**  -- Nash.

15             **MR. BUCHANAN:**  Good afternoon, your Honor.  Jim

16     Buchanan, from Welder Leshin, in Corpus Christi, on behalf of

17     SPV SAM Eagle, Inc.

18             And I am joined by Mr. Michael Wray and Mr. Chris

19     Hart, from the firm of Holman Fenwick Willan, in their Houston

20     office.

21             **THE COURT:**  Okay, and who is going to be arguing

22     primarily today on behalf of the Plaintiff?

23             **MR. FLOYD:**  That would be I, your Honor.

24             **THE COURT:**  Mr. Floyd?

25             **MR. FLOYD:**  Yes.

4

1          **THE COURT:**  And then, mister --

2          **MR. BUCHANAN:**  Mr. Hart and Mr. Wray will both be

3    arguing on behalf of SPV SAM Eagle.

4          **THE COURT:**  Okay, and Mr. Nork, you mean?

5          And who's arguing on -- I'm sorry.  Who's arguing on

6    behalf of the Defendant?

7          **MR. WRAY:**  Your Honor, this is Michael Wray.  Myself

8    and Mr. Hart will be splitting the argument.

9          **THE COURT:**  Oh, okay.  It's the Ray; W-r-a-y?

10          **MR. WRAY:**  Yes, your Honor.

11          **THE COURT:**  Okay.  All right, sorry.  You can be

12    seated.  Thank you.

13          All right.  So I guess everybody agrees that the

14    burden is going to be on the Plaintiff in this hearing?

15          **MR. FLOYD:**  Yes, your Honor.

16          **THE COURT:**  Okay, but it's the Defense motion.

17          But let me hear from the Defense, first, on the

18    motions, and then we'll hear from the Plaintiff.

19          **MR. WRAY:**  Thank you, your Honor.

20          **THE COURT:**  Mr. Wray?

21          **MR. WRAY:**  Good afternoon, your Honor.  Michael Wray

22    on behalf of Defendant SPV SAM Eagle.

23          In this argument, I'm going to handle the

24    introduction, I want to address the burden of proof and the

25    mis-delivery claim.

1          Mister -- then I'll turn to Mr. Hart, who will come

2    up and address the alter ego issues.

3          Then I will -- then he's going to flip it back to me

4    to address the fraud and do a summation.

5          **THE COURT:**  Okay.

6          **MR. WRAY:**  So why are we here today?  FIMBank has

7    asserted a *quasi in rem* claim against the -- and attached the

8    SPV SAM Eagle vessel.

9          The vessel is owned by SPV SAM Eagle, Inc.

10          They've attached the vessel as a form of security for

11    a loan in arbitration against a third-party, Discover

12    Investment Company, arising out of the carriage of grain aboard

13    the M/V NIKA, to Egypt, in 2018.

14          What we think the evidence shows is FIMBank -- they

15    finance merchants and traders.  They made a bad loan to a

16    company called, "AOS."

17          AOS was the company that was going to buy this grain

18    in the Ukraine and sell it in Egypt.

19          FIMBank sued AOS, obtained a $20 million judgment in

20    the Dubai courts.  And we're here today because they can't

21    enforce it.  The problem is, they've attached the wrong vessel.

22          The M/V NIKA, the vessel that actually carried the

23    grain and delivered it to Egypt -- owned by Discover Investment

24    Company -- is an active vessel.

25          There's a live *in-rem* claim against the NIKA, now

1    called, "The Nord."  That's the vessel that FIMBank should have

2    arrested.

3              In fact, the evidence they put in to the Court shows

4    that they tracked the vessel's movement and they're perfectly

5    capable of arresting that ship any time they want.

6              So we're here today because a vessel owned by a third

7    party, that had nothing to do with the underlying transaction,

8    was attached based upon a rather thin veil-piercing theory.

9              **THE COURT:**  Okay, wait.  But I understand that, I

10   think.

11             **MR. WRAY:**  Uh-huh.

12             **THE COURT:**  Now, who was -- who did I talk to at the

13   *ex parte* hearing?  Was it Mr. Nash?

14             **MR. NASH:**  Yes, your Honor.

15             **THE COURT:**  Okay, and as I recall, I asked, "Is this

16   a maritime claim or an admiralty claim?"  And you said, "No."

17   Is that right?

18             There wasn't any intention to prove that there was a

19   connection of the vessel we have arrested with the underlying

20   claim; just that the vessel is owned by the same people.

21             Did I get that right?

22             **MR. NASH:**  Not entirely, your Honor.

23             **THE COURT:**  Okay, you'll have to put up with me.  I'm

24   sorry.  I just want --

25             **MR. WRAY:**  Of course, your Honor.

1          **THE COURT:**  -- to understand this.

2          **MR. NASH:**  So the -- first of all, it is a maritime

3    claim.

4          Second of all, the vessel that is attached, the M/V

5    Sam Eagle --

6          **THE COURT:**  But it was never the NIKA?

7          **MR. NASH:**  That is correct.

8          **THE COURT:**  That's right.  Okay, so that was the

9    whole point.

10         It wasn't the NIKA and it wasn't proceeding -- I

11   understand what you mean about being a maritime claim.  But it

12   was never an attempt to say the NIKA was the Sam Eagle, right?

13         Okay, so I just want to understand.  Go ahead.

14         Thank you.  You may be seated.

15         Go ahead, Mr. Wray.

16         **MR. WRAY:**  And, your Honor, I think you seized a very

17   important point.

18         These are separate vessels owned by separate and

19   distinct companies.

20         Now, as your Honor mentioned earlier, it is -- this

21   is a show cause hearing, under Rule (E)(4)(f).  The Plaintiff

22   has the burden of proof -- in this case, FIMBank -- that they

23   had to come forth with competent evidence that there are

24   reasonable grounds to maintain the attachment.

25         This is more than just a notice-pleading standard

1   under Rule 8.  So what they have to show today -- as we sit

2   here today, the evidence in the record -- that they are legally

3   entitled to maintain this attachment.

4           Now, Rule (b) is strictly construed, because it

5   deprives people of their property.

6           In this case, the vessel Sam Eagle has been -- the

7   owners have been deprived of property for over two months.

8           So the reasonable ground standards is that it's more

9   likely than not that the alleged facts are true.  It's a

10  heightened pleading standard, which we don't think they can

11  meet today.

12          Now, what hurdles does FIMBank have to overcome

13  today?

14          Well, Rule B itself -- which they proceeded under --

15  requires a very -- a maritime claim supported by a verified

16  pleading.

17          In this case, the maritime claim they've identified

18  is the alleged mis-delivery of cargo, carried by the NIKA, in

19  2018, in Egypt.  That's the first hurdle.

20          The second hurdle is, under this Circuit's case law,

21  they have to show that the Sam Eagle -- sitting here in Corpus

22  Christi Bay -- is the property of Discover Investment.

23          Now, the way they have alleged it, at least

24  initially, was that there was a company called, "SAM Geneva,

25  slash, SAM Panama," dominating control of Discover and, in

1    turn, dominating and controlled SPV SAM Eagle.

2              So they have a double veil-piercing standard to show

3    that the property, here in Texas, is actually Discover

4    Investments' property.

5              So, first thing, all -- if they have to meet their

6    alter ego factors -- and those alter ego factors must have

7    existed at the time of the underlying grain carriage, in 2018.

8              And the second legal requirement in a veil-piercing

9    hearing -- analysis, in this Circuit, is that the corporate

10   form must have been used to commit a fraud or wrongdoing or

11   injustice at the time of the underlying transaction

12             Now, that's quite a few hurdles they have to come

13   through.  And what have -- what evidence have they actually

14   brought forward to this Court?

15             Well, their initial verification, executed by

16   FIMBank's general Counsel, an interested witness -- admits that

17   half the facts in the petition were upon information and belief

18   and they lacked personal knowledge, particularly dealing with

19   the veil-piercing allegations.

20             They put in a declaration, from their trial Counsel,

21   summarizing a conversation he had with a SAM Geneva employee,

22   who left in 2014, four years before the transaction of issue --

23   which is nothing but hearsay.

24             And they put copious amounts of pronouncing theories

25   of maritime databases, particularly Equasis.  What I find

1   interesting about those databases is they all have disclaimers.

2   The information here is not reliable.  They disclaim

3   responsibility for it and it shouldn't be used.

4          So one of the -- as an example -- this is on Equasis'

5   website, which I looked at this morning.  They refer to data

6   from the IHS maritime.  And the disclaimer for that company is,

7   "IHS data must never be used for commercial purposes or to

8   produce a commercial product or service."

9          So they have hearsay upon hearsay.  Google pronounce

10  and the declaration of a ship broker has no personal knowledge

11  of any of the transactions.

12         So given the standard of the burden of proof they

13  have today and the evidence they've -- we think our briefing

14  more than shows that evidence is incompetent to maintain their

15  burden.

16         Now, turning to the mis-delivery claim, (indisc.)

17  procedural mechanism.  The Fifth Circuit, in the Alphamate

18  decision, clearly identifying that to support a marine

19  attachment, you have to have an underlying maritime claim.

20         And without a valid maritime claim, there cannot be

21  an attachment.  In other words, what maritime contract today

22  has a FIMBank (indisc.)?

23         Well, they weren't the charterers of the NIKA; they

24  weren't the shippers of the cargo; they weren't the consignee

25  of the cargo.

1          What FIMBank has identified is that they were holders

2     of a bill of lading for this grain.  And they held it as

3     security for the loan they made to AOS.

4          Now, the simple fact of being a holder of a

5     negotiable instrument -- in this case, the bill of lading

6     served as a title document, because these were two order bills.

7          Two order bills was, anybody who had a copy of that

8     two order bill could go to the warehouse in Egypt and request

9     the cargo.

10         So while they talked about, "We have these bills of

11    lading; we had the bills of lading," they never say what the

12    ship did wrong in Egypt.

13         They state it's their position the cargo was mis-

14    delivered, but there was no facts alleged in the complaint that

15    says how, to who, what happened to this cargo, or how did the

16    vessel tender the cargo to somebody who is not lawfully

17    entitled to receive it.

18         In fact, the law actually requires that the vessel

19    owner tender the cargo to a holder of an order bill.

20         And that's supported by (indisc.) partners case,

21    cited in our brief.

22         So what information have they put forth in the record

23    to support the mis-delivery claim?

24         FIMBank had original bills of lading.  FIMBank then

25    transmitted those original bills of lading to a bank in Egypt,

1   called, "BLOM Bank," which then asked BLOM Bank not to release

2   the bills of lading until FIMBank got paid.

3           So by tendering those bills of lading, they've

4   released their security interest.  And if BLOM Bank didn't do

5   their job and gave those bills of lading to third parties in

6   Egypt to collect the cargo, that's an issue between BLOM Bank

7   and FIMBank; it's between FIMBank and AOS.  Has nothing to do

8   with the ship.

9           So we think a glaring omission from their complaint

10  is, when did the ship do wrong?

11          Others going to say, it's our position it was mis-

12  delivered.  Well, that's a legal conclusion.  It's our position

13  that the attachment shouldn't be -- should be vacated.  But the

14  Court has to look at the pleadings and the evidence to make

15  that determination.

16          So, in short, we think that the first hurdle that

17  there's a valid maritime claim for mis-delivery fails.  And

18  without that, the whole house of cards collapses.

19          And with that point, your Honor, I'll turn now to my

20  colleague Mr. Hart, who will address the alter ego factors.

21          **THE COURT:**  Okay, Mr. Hart?

22          **MR. WRAY:**  Thank you, your Honor.

23          **MR. FLOYD:**  Your Honor, may I ask, just in the

24  interest of simplicity, if I could address those parts now?  It

25  just may move things along and keep things orderly.

1          **THE COURT:**  Well, all right.  I'll give you a chance.

2          We'll see.  I just want to -- I was -- I need to

3     understand all of this.

4          **MR. FLOYD:**  Understood, your Honor.  Thank you.

5          **THE COURT:**  All right, why don't you go ahead --

6          **MR. FLOYD:**  Thank you, your Honor.

7          **THE COURT:**  -- Mr. Floyd.

8          **MR. FLOYD:**  I may not go in the same order as my

9     adversary did there.  But there were a number of points that he

10    raised that I just thought should be addressed at the outset

11    here.

12         First of all, regarding the nature of Rule B in the

13    requirements for obtaining a Rule B attachment, I don't think

14    that there's any dispute regarding the law on that.

15         There's four prongs or four elements to the analysis.

16         First, that the Plaintiff has alleged a *prima facie*

17    valid maritime claim; second, that the Defendant or Defendants

18    cannot be found within the Federal District; third, that the

19    Defendan, or Defendants' property can be found here; and,

20    fourth, that there are no statutory or maritime law bars to the

21    attachment.

22         My understanding of the motion is that the only prong

23    that's being challenged here today is the first one; whether or

24    not the Plaintiff has asserted alleged a *prima facie* valid

25    maritime claim.

1           And that's being attacked on two grounds -- or two

2   angles; the first being the underlying dispute, and the second

3   one being the alter ego allegations.

4           For point of clarification, when I say, "underlying

5   dispute," what I'm referring to there is the underlying dispute

6   between FIMBank, as the holder in due course of original bills

7   of lading, and the owner of the NORD -- which is the vessel's

8   name now; formally known as the ex-NIKA, which is what it was

9   called as of early 2018, when this voyage was performed,

10  carrying wheat from Russia to Egypt.

11          That underlying dispute concerns a claim for mis-

12  delivery of cargo.  That claim is already subject to

13  arbitration in England, pursuant to an arbitration agreement.

14          There's some dispute over there as to which contract

15  governs the precise terms in the body of arbitration, as I

16  understand it.  But --

17          **THE COURT:**  Let me just stop you for just a minute.

18          Was Counsel correct when he said that -- what I want

19  to know is, is there a case -- if you're disputing whether or

20  not there's a maritime claim, I don't think anybody's disputing

21  that the claim against the NIKA, that's in arbitration -- no

22  one's claiming that's not a maritime claim; is that right?

23          **MR. WRAY:**  Your Honor, the claim in arbitration

24  against the NICA is in Europe.

25          **THE COURT:**  Okay.  Okay, so if the claim in

1   arbitration is a maritime claim and -- so what I need is not

2   the facts of the case.

3           What I really need from you is a case that says that

4   that kind of a dispute can be used to -- as the basis for a

5   maritime attachment.  Now, does that then go strictly to the

6   alter ego argument?

7           **MR. WRAY:**  If I may, my colleague (indisc.).  A

8   maritime -- they have to put forth a valid maritime claim,

9   initially, to support a moving attachment here in the U.S.

10          **THE COURT:**  Right, right.

11          **MR. WRAY:**  Alphamate, the case that directs that

12  specifically with the Court -- what was at issue?

13          Was it a maritime claim or was it not a maritime.

14  That was also a grain or commodities trading contract that had

15  a vessel involved.

16          And the Fifth Circuit said, "No, given the facts of

17  that case, there was no maritime claim."  So, therefore, the

18  attachment fell through.

19          We do not see it here today.  They've articulated a

20  valid maritime claim purely based on (indisc.) as a holder of a

21  bill of lading.

22          **MR. FLOYD:**  But Alphamate -- it's been a while since

23  I've read the case.

24          **THE COURT:**  Okay.

25          **MR. FLOYD:**  I've read a number of times.

1    **THE COURT:**  Okay, go ahead, mister --

2    **MR. FLOYD:**  Alphamate was a claim arising from a

3    sales contract -- purchase and sales contract.

4    And the issue there was whether -- or whether it was

5    on FOB terms or CIF terms -- whether a sale contract that

6    contains some maritime terms in it, such as "demurrage" or who

7    pays for the shipping, *et cetera* -- whether that can arise to

8    being a maritime contract.

9    And the Fifth Circuit held, in Alphamate, that a sale

10   contract is not a shipping contract and is not a maritime

11   contract.  However, that has absolutely nothing to do with a

12   bill of lading.

13   A bill of lading is most certainly -- depending upon

14   who holds it, a bill of lading is a maritime contract.

15   Bills of lading -- and I think it's pretty

16   axiomatic -- served several purposes.  One, they're a document

17   of title; one, they're a receipt of the goods by the ship; and

18   the third one, when a bill of lading is held by somebody who is

19   not the charterer of the vessel, then in their hands, that bill

20   of lading is the contract of carriage.

21   In this situation here, the bill of lading went to --

22   actually, the 61 bills of lading; and about 20-some of those

23   are at issue.

24   The bills of lading went to FIMBank.  FIMBank held

25   them as a holder in due course because it was financing the

1   underlying trade.

2         FIMBank sent those bills of lading on out for

3   collection, as it's termed in the industry, meaning that the

4   bills of lading are used to receive payment, and the person who

5   makes payment for the cargo represented by the bill then goes

6   and gets the cargo.

7         In this situation, the bills of lading went on out

8   for collection.  Then BLOM Bank -- or BLOM Bank sent those

9   bills -- a number of them -- back to FIMBank and said, "Sorry,"

10  basically.  "Cargo's gone, but here's the bills.  We didn't get

11  paid, and you're not getting paid."

12        That's a mis-delivery claim there.  Something

13  happened to that cargo that it was allowed to go forth without

14  proper presentation of the original bills of lading.  But all

15  of that is subject to arbitration in London.

16        The sole point here that matters is that there were

17  bills of lading, bills of lading constitute maritime contracts

18  and the claim or the underlying disputes of the arbitration in

19  London, and London Maritime Arbitration Association rules is a

20  maritime claim.

21        We then shift from clearly having an underlying

22  maritime claim on over to the true issue here, which are -- is

23  the alter ego allegations.  That's what's really at issue here.

24        And there's hundreds of cases -- and I've been

25  involved in a good number of them -- recognizing, of course,

18

1    that if an underlying dispute constitutes maritime dispute,

2    falls within the scope of the Court's maritime jurisdiction,

3    then a claim to enforce that, based upon an alter ego theory of

4    liability, also falls within the Court's maritime jurisdiction

5    and suffices for purposes of the first prong of Rule B; that

6    prong being whether the Plaintiff has set forth a *prima facie*

7    valid maritime claim.

8            On that, mister -- my adversary made some assertions

9    regarding the burden of proof.  We are not arguing against the

10   fact that those four prongs, initially, at least, fall on the

11   Plaintiff to properly allege.

12           However, there was an assertion made that

13   evidence, and fully admissible evidence, needs to be presented

14   at this early stage regarding an alter ego claim and

15   demonstrating, by a preponderance, that the alter ego claim is

16   more likely than not to succeed.

17           I do not agree that that is correct.  One case cited

18   in our opposition memo would be the White Rosebay decision by

19   Judge Ramos, which, quite specifically, held that all that is

20   required at this early stage is that the allegations in the

21   complaint, together with documents and materials submitted in

22   connection with the so-called Rule 4(e), (4)(f) motion

23   practice -- which is what we're at right now -- can justify or

24   is sufficient to support a reasonable inference that the alter

25   ego allegations are valid and might succeed.

1          I'm sure we'll get to it later on here regarding

2     those allegations and the supporting materials, but we're

3     looking for, solely, a reasonable inference at this point.

4          To say and suggest that FIMBank has to come forward

5     with conclusive evidence at this point to definitively resolve

6     the dispute is precisely contrary to the decision in White

7     Rosebay; in fact, that was expressly rejected in that decision.

8          Instead, it's sufficient information to support a

9     reasonable belief.  And what will ordinarily occur thereafter

10    is that because Rule B is inherently a jurisdictional tool --

11    jurisdiction device for establishing *quasi in rem* personal

12    jurisdiction over one or more Defendants.

13         And of course -- and oftentimes said -- and, again,

14    these decisions are cited in our brief -- that, early in a

15    case, disputed allegations of personal jurisdiction can be a

16    bit hazy or fuzzy.  It warrants discovery.

17         And to the extent the Court has any doubts regarding

18    the validity and the strength of the allegations to date, I

19    would strongly propose that expedited -- and certainly

20    expedited -- but expedited discovery would be fully appropriate

21    in these circumstances.

22         In my mind, where I think that that would be is

23    expedited discovery concerning the ultimate ownership of each

24    of these companies.

25         I'm pretty certain I know who is the ultimate

1  beneficial owner.  And that that would be the same UBO or

2  ultimate beneficial owner identified as a UBO in some of the

3  mortgage documents that we've submitted, a Ms. Irina Pomelova,

4  of Moscow, who owns these companies via a series of offshore

5  companies out of Hong Kong, and then in Panama and elsewhere,

6  including Liberia.

7          But discovery regarding ownership; discovery

8  regarding the insurance -- because as pointed out, in our

9  papers, there's this very shockingly unique situation where

10  Steamship Mutual P&I Club issued sequential renewal notices --

11  renewal numbers two years in a row for each of the ships,

12  including the NIKA and including the SAM -- which we say all

13  fall within --

14          **MR. WRAY:**  Your Honor --

15          **MR. FLOYD:**  -- the same ownership fleet.

16          **THE COURT:**  Yes, sir?

17          **MR. FLOYD:**  I'm good.

18          **MR. WRAY:**  Mis-delivery plan -- we're just going to

19  the (indisc.).

20          **MR. FLOYD:**  I'm good now, sir.  You can step up

21  there.

22          **THE COURT:**  This was a bad idea.

23          Okay, Mr. Hart, are you going to address alter ego?

24          **MR. WRAY:**  Yes, ma'am.  I'd like to make one rebuttal

25  point and (indisc.) so we can close that off.

1          **THE COURT:**  Well, you're going to confuse me.

2          **MR. WRAY:**  That's right.

3          **THE COURT:**  I'm just going to hear from everybody --

4          **MR. WRAY:**  Then I'll let Mr. Hart --

5          **THE COURT:**  And then, if you have anything else you

6     want to say to rebut, then you can do it then.

7          **MR. WRAY:**  I'll save it for redirect.

8          **THE COURT:**  Because I'm getting confused.

9          Go ahead, Mr. Hart.

10          **MR. HART:**  Thank you, your Honor.  But what I intend

11     to address are the --

12          **THE COURT:**  So what is the problem with ordering some

13     expedited discovery on this issue?

14          You're never going to get me to agree that he has to

15     prove that by a preponderance of the evidence at this point.

16          **MR. HART:**  Understand.  But under the standards of

17     the Rule E(4)(f) hearing and the Rule B situation with the

18     attachment of property -- that's why this situation is very

19     different from notice pleadings.

20          And it's why the standard that a Defendant --

21          **THE COURT:**  I understand that.

22          **MR. HART:**  -- the proponent of an attachment --

23          **THE COURT:**  I understand that.  But --

24          **MR. HART:**  -- has to do much more.

25          **THE COURT:**  I understand that.

1          But how is the Plaintiff supposed to be able to get

2    that information unless they have a short period of discovery

3    where they can try to take depositions and do all those other

4    things that they do?

5          **MR. HART:**  They've actually already come forward with

6    their information, your Honor.  And today is the day, at this

7    hearing, that Rule (E)(4)(f) says that the proponent of the

8    attachment has the burden to show why the attachment should not

9    be vacated.

10          And the reason why the --

11          **THE COURT:**  No.  You've not conducted any discovery

12   at this point.

13          **MR. HART:**  And that's why this is -- Rule B is such

14   an exceptional remedy, your Honor.  Because it deprives my

15   client --

16          **THE COURT:**  I understand that.

17          **MR. HART:**  -- of property.

18          **THE COURT:**  I understand that.  I'm talking about --

19          **MR. HART:**  It's an exceptional --

20          **THE COURT:**  -- expedited discovery.

21          I'm not talking about letting some period of time

22   pass while the parties are exchanging preliminary motions.

23          **MR. HART:**  Understand, your Honor.

24          In the event that expedited discovery is allowed here

25   and goes forward, we would ask that the Court not even

1    entertain that idea, unless the Court also requires FIMBank to

2    deposit money to cover the custodial expenses for keeping the

3    vessel under attachment.

4            The vessel's already been deprived, from SPV SAM

5    Eagle, for two months.  It's already been here for two months.

6    And quite a bit of custodial expenses have already been

7    incurred by the vessel.

8            If FIMBank wants more time to conduct a discovery

9    fishing expedition to try to find out what if they might

10   discover some alter ego facts --

11           **THE COURT:**  I'm not going to do that.

12           **MR. HART:**  -- then they should be entitled.

13           **THE COURT:**  I'm not going to do that.

14           You can appeal and go to Judge Ramos.  But the

15   Plaintiff -- I mean, the real issue is, why didn't you reduce

16   those costs by posting a bond that you would get back if there

17   was no showing of alter ego?

18           **MR. HART:**  Well, here, your Honor, the problem is

19   that the owner of the property is not required to post a bond.

20           And here, that's all their asking for.  What they're

21   asking for is a bond to secure --

22           **THE COURT:**  Right.

23           **MR. HART:**  -- what they hope to be payment,

24   eventually.

25           **THE COURT:**  Right.  And they have to make a --

24

1       **MR. HART:**  That's all they're --

2       **THE COURT:**  -- preliminary --

3       **MR. HART:**  -- asking for.

4       **THE COURT:**  -- showing of that.  And that's why we're

5  having this hearing.

6          And that's why I'm asking, why can't we have a period

7  of discovery for that?

8       **MR. HART:**  We would ask the Court not to grant them

9  time for a period of discovery because today --

10         Because, today, what I'm about to explain is why the

11 facts that they have alleged and the evidence that they have

12 brought forward is insufficient for anybody to draw a

13 reasonable inference that they could be successful on proving

14 their alter ego allegations and piercing the corporate veil.

15         What they have alleged is not sufficient.

16      **THE COURT:**  Okay, well why don't you go ahead and

17 make your argument, Mr. Hart.

18      **MR. HART:**  Thank you, your Honor.

19         What I'm going to do is address the alter ego factors

20 that the Fifth Circuit and the Courts -- District Courts, here,

21 within the Fifth Circuit have applied to these maritime alter

22 ego cases.

23         As the Court is well aware, this is not the first

24 time a Plaintiff has tried to attach somebody else's property

25 under an alter ego theory.

25

1          THE COURT:  You can sit wherever you want.

2          MR. SPEAKER:  Thank you, your Honor.

3          MR. SPEAKER:  Thank you, your Honor.

4          MS. SPEAKER:  Judge, do you want to get a chair and

5   put them on top --

6          Can you grab that chair there --

7          MR. SPEAKER:  Sure.

8          MS. SPEAKER:  -- and just maybe -- or, yeah, one of

9   the chairs and just put them on top, Judge.  Because we --

10          THE COURT:  Well, because I can't see the -- yeah, I

11   can't see the bottom.

12          MS. SPEAKER:  Yeah.  Is that good for you or --

13          THE COURT:  I don't know that they'll stay.

14          MS. SPEAKER:  Oh, okay.

15          MR. HART:  Your Honor, what I'm holding here is a

16   chart that summarizes some of the information that's in the

17   declaration of Dennis Saevski.

18          THE COURT:  Uh-huh.

19          MR. HART:  That's the evidence attached to our reply

20   brief.

21          THE COURT:  Yes, sir.

22          MR. HART:  And what that -- what this does is show

23   the separate structure of the ownership -- separate structure

24   of the corporations that own these two vessels.

25          You know, on the right here, we have the M/V NICA,

1    which is the vessel that carried the grain and delivered it in

2    Egypt -- which is the vessel that's the subject of what FIMBank

3    calls its underlying dispute.

4            THE COURT:  I understand.  The SAM Eagle's the thing

5    that's here.

6            MR. HART:  SAM Eagle's the other ship.

7            THE COURT:  Nobody's disputing that they're different

8    vessels.

9            MR. HART:  Understand.

10           They also have different owners, your Honor; the

11   corporations that own them are different.  And the ultimate

12   owners are also different sole private investors.

13           Counsel just alleged, in his argument, that he seems

14   to think that the ultimate beneficial owners of each vessels is

15   Ms. Irina Pomelova.  I think that's what he just said.

16           Mr. Saevski's declaration demonstrates and proves

17   that that is false.

18           THE COURT:  Well, I know.  But where are the

19   documents to support that?

20           Doesn't he have the right to get the documents to

21   support what's in the declaration?

22           MR. HART:  I think he does not, your Honor, without

23   more evidence to support any of these alter ego allegations.

24           THE COURT:  Okay, so your point is, he just doesn't

25   have the right?

27

1      **MR. HART:**  That's right.  Because they can't meet any

2  other factors on alter ego allegations, your Honor

3          **THE COURT:**  Okay.

4          **MR. HART:**  They've got lots of evidence.

5          In fact, this entire notebook -- you know, is a

6  copy -- as the Court's seen, there are many exhibits in their

7  response.

8          And they've got lots of papers, lots of argument --

9  and very confusing argument in their complaint and their

10  response and lots of papers.

11          But what I would like to do is to show the Court that

12  all those papers and all those arguments, they do not meet --

13  they do not raise a reasonable inference of virtually any of

14  these --

15          **THE COURT:**  I hate to tell you this, but --

16          **MR. HART:**  -- alter ego factors.

17          **THE COURT:**  -- I cannot read those.  You're going to

18  have to bring it up closer.  I'm old.

19          **MR. HART:**  (Indisc.).

20          **THE COURT:**  Okay, I can see it now.

21          **MR. HART:**  So this is a summary.  That's why there's

22  so many.  Because there are 19 factors from the Fifth Circuit

23  cases that are the guidelines for Courts to consider in

24  deciding whether evidence is sufficient to meet an alter ego

25  veil-piercing theory.

1          So we've listed all 19 of them here to help me

2    remember what they are, to go through them.  And they're also

3    listed in our reply brief, your Honor.  And what I'd like to do

4    is point out why their evidence really does not even raise a

5    reasonable inference of --

6          **THE COURT:**  Okay, wait.  Just a minute.

7          **MR. HART:**  -- of success on these factors.

8          **THE COURT:**  Let me ask.

9          Mr. Floyd, is it your position -- do you agree to the

10   law?  Do you agree about the law of alter ego?

11         **MR. FLOYD:**  In general, your Honor.

12         **THE COURT:**  I'm not talking about the facts; I'm

13   talking about the law.

14         **MR. FLOYD:**  Talking about the law of the factors that

15   they've identified are consistent with the factors that Courts

16   have, across the country and also within the Fifth Circuit,

17   most importantly, identified.

18         However, they're always identified as being non-

19   exclusive factors and also identified in connection --

20         **THE COURT:**  Okay, but --

21         **MR. FLOYD:**  -- with the proposition --

22         **THE COURT:**  Okay.

23         **MR. FLOYD:**  -- not entered.

24         **THE COURT:**  I understand that.  But is it -- and it's

25   your -- is it your position that you don't have that all -- any

1  of those things and you need discovery to get it?

2          **MR. FLOYD:**  Oh, no, your Honor.  We certainly have

3  the allegations and documents to support a good amount of that.

4          But what I'd like to get discovery on is a number of

5  things.  But say, for one, the demonstrative exhibit over here

6  that has at the top of each chain, sole private investor, on

7  two different sides there -- and Mr. Hart -- correct?  Sorry.

8          **MR. HART:**  Yes, Counsel.

9          **MR. FLOYD:**  Thank you.

10          -- has said that, you know, "that's not Ms. Pomelova

11  who sits at the top there."

12          I realize that.  I see, in Mr. Saevski's declaration

13  that he very conveniently refers to a sole investor being a

14  person.  And persons, in my mind, constitute -- cover both

15  individuals and artificial entities.

16          And quite certain that -- you know, one thing that

17  we'd like to look for in discovery is at the top of that chain

18  there, the two sole private investors, who are they?  And who

19  is the UBO -- the ultimate beneficial owner?  That's the real

20  question.

21          When -- we're not talking here about any publicly

22  traded companies where people like me might have a share or

23  two.  We're talking about privately-held companies, where

24  there's going to be one, maybe two, family members sitting at

25  the top, who own everything.

1          And that's who the ultimate beneficial owner is going

2    to be.  And what we'd like to see is that chart over there

3    coming together with a little teepee at the top to show --

4          **THE COURT:**  Okay.

5          **MR. FLOYD:**  -- the name.

6          **THE COURT:**  Okay, thank you.

7          I want all of the parties to keep note about, if I do

8    order discovery at the end of this, what exactly discover --

9    what discovery is going to be allowed?  Okay?

10         Now, you may continue, Mr. Hart.

11         **MR. HART:**  Your Honor, I'd like to point out that

12   what Counsel just asserted is nothing but pure speculation.

13         **THE COURT:**  Okay, but don't use those words, please.

14   Just tell me what your proof is.

15         **MR. HART:**  For the guidelines that the Fifth Circuit

16   says --

17         **THE COURT:**  Everybody agrees.

18         **MR. HART:**  -- to consider --

19         **THE COURT:**  -- those are the guidelines.

20         **MR. HART:**  "Is there a common stock ownership between

21   the two owners of these two vessels?"

22         There is no evidence of that, your Honor.  There's no

23   evidence or argument that the stock of SPV SAM Eagle -- the

24   stock owner of SPV SAM Eagle, Inc. is in common with any stock

25   holder of Discover Investment Corp.

31

1          In fact, just the opposite is true, based on that

2    declaration.

3          So this first regarding factor, the answer is, "No,

4    there is no evidence of that factor."

5          "Do the parent and subsidiary have common directors

6    or officers?"

7          "The answer again is, "No."

8          The allegations and the evidence that FIMBank has put

9    forward do not establish that.  They have pointed out that they

10   have identified that some of the SAM entities have directors

11   who are Panamanian persons in Panama.

12         But there's absolutely no evidence of any overlap of

13   those directors with Discover Investment Corp.

14         So that is not any evidence that would support a

15   reasonable inference that there are common officers and

16   directors between Discover Investment Corp. and SPV SAM Eagle,

17   or even this SAM Geneva or SAM Panama entity.

18         It's simply not.  They -- all it does is show the

19   identities of directors of a few Panamanian entities.

20         So there's no evidence here to raise a reasonable

21   inference on Factor Number Three.

22         Number Four asks, "Do the companies, the parent, and

23   the subsidiary file consolidated financial statements?"

24         If that answer is, "No."

25         FIMBank has no evidence and no -- not even an

1    allegation that there are -- of that factor.

2            "Does the parent finance the subsidiary?"

3            There's no direct evidence of that at all.  In fact,

4    the evidence that FIMBank has produced in their response proves

5    just the opposite.

6            There, among their documents, are ship mortgages,

7    which Counsel has referred to here.  And there are several ship

8    mortgages for some of these SAM vessels.

9            But what that is evidence of is a bank.  It's an

10   arm's length trans -- loan transaction with a bank.  Their ship

11   mortgage is given by the Credit Suisse Bank.

12           So that just proves just the opposite.  It's not any

13   parents financing a subsidiary; it's a bank financing the

14   purchase of these vessels.

15           So the answer -- on that factor, there truly is no

16   evidence that could raise a reasonable inference of the

17   existence of that factor of piercing the corporate veil.

18           "Did the parent cause the incorporation of the

19   subsidiary?"

20           There's no allegation in the complaint about that or

21   the response or evidence.

22           So the answer is, "No," on that factor.

23           "Is the subsidiary operating with grossly inadequate

24   capital?"

25           Here, FIMBank has no evidence.  And I discern no

33

1    argument or allegation about grossly inadequate capitalization

2    of either of these entities.

3           The next factor down here says, "Does the parent pay

4    salaries and expenses of the subsidiary?"

5           There's no evidence or even an allegation of that

6    factor either.

7           Factor Number Nine asks, "Does the subsidiary receive

8    no business except that given by the parent?"

9           Here, I'd say again, there's no direct evidence of

10   that, but there's lots of innuendo and insinuation in FIMBank's

11   argument that, because the two ships -- the SAM Eagle and the

12   NIKA -- both have the same commercial ship manager, that,

13   therefore, they receive all their business from that commercial

14   manager.

15          But there's significant problem with that, from

16   FIMBank's perspective.  And this -- I'd like to explain why

17   that is not evidence that raises a reasonable inference of any

18   of these alter ego factors.

19          And that's because the -- there's no crime and

20   there's nothing nefarious about having a contract with a

21   commercial ship manager.

22          Instead, it's very common.  In fact, it's so common

23   that there are form contracts for these commercial ship

24   management contracts.

25          We have introduced in our -- or we've attached, in

34

1    our reply brief, copies of the ship management contracts.

2    They're there, attached to Mr. Saevski's declaration.

3           And so there is evidence now of the ship management

4    contract between SPV SAM Eagle and this entity called SAM

5    Panama -- of course, the entity called SAM Panama to manage the

6    SAM Eagle.

7           And there's another copy of a separate contract

8    between Discover Investment Corp. and SAM Panama -- it's the

9    same company -- to manage the M/V NICA.

10          What that is, is evidence of an arm's length

11   transaction to enter into a commercial management agreement.

12          They are entered into by two separate corporate

13   entities.  What that does is demonstrate corporate

14   separateness.

15          It demonstrates that these corporations are observing

16   corporate formalities.  It demonstrates that SAM Panama is

17   certainly not dominating and controlling either of the other

18   entities; in fact, just the opposite is true.

19          The entities that owned the vessels contracted for

20   SAM Panama -- for SAM Panama to provide the services.  And so

21   those owner-entities pay a fee to SAM Panama to commercially

22   manage the vessels.

23          What the commercial manager is required to do, by its

24   contract, is written right into the shipman form contracts that

25   are in evidence.

35

1         They're actually in their file as Document Number

2    27 -- 27-3.  They're all in 27-3; they're Exhibits B, C, and D,

3    to Dennis Saevski's declaration.

4         I'd like to point out to the Court that there

5    absolutely is nothing nefarious about a ship -- commercial ship

6    manager managing several ships owned by several different

7    companies.

8         It is so common, that there's a form contract

9    available for this kind of contract.  It's called a "shipman."

10   It's a BIMCO form contract.

11        And the Court will see, in these exhibits, that it's

12   so standardized, there are boxes.  And this is basically --

13   this a fill-in-the-box contract.  And it's done here by these

14   entities.

15        So circling back to the alter ego factors, the ships

16   receive business that the commercial manager goes up to get for

17   them.

18        But the reason a commercial manager does that is

19   because that's it's contractually obligated job.  They're

20   getting paid a fee to go out and find charters and even

21   authority to execute the charter parties to find commercial

22   business for these ships.

23        So that is absolutely not evidence of a parent --

24   either of these parent entities -- wherever they are in the

25   corporate chain, it is not evidence of a parent providing all

1    the business -- the ones the subsidiaries gets.  In fact, it

2    disproves that element of alter ego.

3             Because what it does is prove that these corporate

4    entities have contracted with somebody else, in an arm's length

5    written agreement transaction, to go out and get that business.

6             So that's why I believe that it's correct, your

7    Honor, to write, "No," for Factor Number Nine, because the

8    evidence actually disproves that element.

9             I got to move on relatively quickly here.

10            "Does the parent use the subsidiary's property as its

11   own?"

12            And, here, there is no evidence or -- I think not

13   even an allegation of that from FIMBank, your Honor.

14            "Does the parent use the subsidiary's property as its

15   own?"

16            Here, there's absolutely no evidence that Discover

17   Investment Corp. used the other entity's property, the vessel

18   that's attached here in Corpus, the M/V SAM Eagle, as if it

19   were its own.

20            Likewise, there's absolutely no evidence that SPV SAM

21   Eagle, Inc. used the NIKA as if it were its own.  And there's

22   no evidence that either of these sole private investors used

23   the other one's property as if it were its own.

24            So that -- the answer to question number ten is, "No,

25   there's not any evidence of that."

1          Instead, just the opposite is true, given this

2    allegation from FIMBank about the sale.  They like to complain

3    about the sale of the NICA -- that Discover Investment Corp.

4    sold the NIKA after this standstill agreement expired.

5          Well, that's just evidence that Discover used its

6    property, the vessel, as if it were its own.  So Discover was

7    entitled to sell the vessel if it wanted to.  And it used its

8    vessel as if it were its own.

9          There's nothing about that -- that factor or any of

10   these others that crosses this vertical black line that is a

11   connection between SPV SAM Eagle and Discover.

12         We go on to Factor Number 11, "Are the daily

13   operations of the two corporations kept separate?"

14         Here, there's no evidence about the daily operations

15   of the actual owner-entities; SPV SAM Eagle or Discover

16   Investment Corp.

17         FIMBank falls back to that allegation about the fact

18   that both vessels have the same commercial manager, which now

19   is the company called SAM Panama.

20         But, again, it's similar to what I said a few minutes

21   ago.  There's absolutely nothing nefarious about that, having a

22   contracted commercial manager for the vessel.  It's common.

23         Nothing about it supports a reasonable inference that

24   the corporate entities ought to be treated as the same just

25   because they have both contracted with the same commercial

1    manager.

2         And if so, I'm writing "no" on that factor, because

3    the fact that they have a common commercial manager does not

4    meet that factor.  But there's no evidence of -- there's any

5    operations departments within the owner-entities that are --

6    that are the same or not kept separate.

7         "Does the subsidiary observe corporate formalities?"

8         Here, the evidence, that even FIMBank submitted,

9    actually supports the fact that, yes, corporate formalities are

10   carefully observed by these companies.

11        They've submitted several copies of the ship

12   mortgages, which, as I've mentioned, are simply evidence of

13   different corporate entities entering into loan transactions

14   with Credit Suisse Bank.

15        They've got additional documents, such as some

16   pledges of stock shares.  In fact, one of their documents is

17   within this dotted line here, they've alleged that there's --

18   that the 100 percent owner of SPV SAM Eagle, Inc. is a company

19   called global -- global-something.

20        And then its shares were pledged to a bank -- a

21   different bank -- D-V -- DVB Bank.

22        And my point about that exhibit is simply that it's

23   evidence that those two corporate entities were carefully

24   observing corporate formalities.

25        And they entered into a written document to document

1   this pledge of shares of the corporation to a bank.  Not --

2   it's important to know that the shares were pledged to a bank,

3   not to anybody else in the corporate structure, and absolutely

4   not to anybody across this vertical line between the two

5   ownership structures of these two vessels.

6           And that's why I believe it is true -- well, it's

7   very true that there's no evidence, of this Factor Number 11,

8   that would support a reasonable inference that the corporations

9   do not observe corporate formalities.

10          Number 13 asks whether the directors of the

11  subsidiary acted in a primary and independent interest of the

12  parent.

13          And, here, they're -- that factor is no.  There is no

14  evidence of that and there's no -- not even an allegation of

15  it.

16          FIMBank has written that they've identified these

17  three directors of some of the Panamanian corporate entities in

18  Panama.  But there's absolutely no assertion that these

19  directors did anything wrong.

20          And absolutely there's no evidence of what directors

21  of Discover Investment Corp. did.  And did they do anything in

22  the primary of its parent entity?

23          It's just not there, your Honor.  So they can't

24  support an inference.

25          Number 14 asks whether others paid for guaranteed

40

1    debts of the dominating corporation.

2            Here, the evidence proves just the opposite, that

3    those same ship mortgage documents indicate that the corporate

4    entities themselves that incurred the debt from the bank had to

5    pay the debt back themselves.

6            There's not any evidence that those note is being

7    guaranteed.

8            But, again, I would point out, even if there were a

9    guarantee of loan is not a crime, it's not nefarious.  And

10   that it's -- in fact, it's common.  And there's no evidence of

11   it here.

12           Whether -- Factor Number 15 is whether the alleged

13   dominator deals with the dominating corporation at arm's

14   length.

15           And here I would say the ship management agreements

16   show that arm's length transactions for the owners to deal with

17   SAM Panama -- those are written agreements that refute this

18   allege -- this factor, as something that would support piercing

19   a corporate veil.

20           I would like to point out something about the

21   dominator or dominee corporation at this point, your Honor.

22           And that's this -- which I think is a significant

23   problem for FIMBank.

24           In their complaint that they used to support the

25   attachment of this case, they very clearly alleged that the

1    company called SAM Geneva is the mastermind and the dominator

2    of both Discover and SPV SAM Eagle.

3            Everything is controlled by the entity called SAM

4    Geneva.  And that's what they used when they came in,

5    presumably for an *ex parte* hearing, to ask this Court to attach

6    this vessel.  That was their alter ego theory, is SAM Geneva is

7    the dominator of all the corporations.

8            Now, they had changed course after they got the

9    vessel attached.

10           In their response pleading, they have actually

11   acknowledged to the Court that they already knew that this

12   entity, SAM Geneva, did not even exist in the year 2018, at the

13   time of this grain carriage by the NICA.

14           Now, shifting gears, they now say that, "Oh, it's not

15   the same Geneva entity.  It must have been -- it must be the

16   SAM Panama entity or some SAM-other entity that is the

17   mastermind that dominates and controls these corporations."

18           That, I would submit, is pure speculation, your

19   Honor.  There's no evidence that SAM Panama dominates anybody.

20           What the evidence now shows is that they knew the

21   allegation they asserted their theory on to begin with, could

22   not be true because SAM Geneva did not even exist.

23           And we know that SAM Panama does not dominate and

24   control because it's just -- provides contractual services

25   under that shipman form contract.

1            So that's why I believe it is correct to write, "No,"

2    for Factor Number 15, your Honor; for those reasons.

3            Number 16 asks, does decision making for the

4    subsidiary -- "Is decision making for the subsidiary made by

5    the parent or its principals?"

6            Here, there's no evidence of that, your Honor, or

7    even a supported allegation.  Any decisions -- they've got

8    nothing about decision making for the SAM Eagle -- for that

9    vessel -- the SAM Eagle here.

10           There's nothing about a parent -- or, significantly,

11   there's no allegation or evidence that any of the SPV SAM Eagle

12   or any SAM entity made decision to control the vessel the NIKA.

13           Instead, the charter party for the NICA clearly shows

14   that the owner of the vessel is Discover Investment Corp.

15           And then later, as they've pointed out, Discover

16   Investment Corp. sold its vessel.  And so -- and within all

17   that, there's no evidence of a decision making being made by

18   the parent.

19           You got no evidence to meet this factor either, your

20   Honor, that the parent and subsidiary used the same corporate

21   office.

22           Here, I would say FIMBank devotes a lot of pages and

23   a lot of argument to addresses or trying to figure out what are

24   the addresses of these various corporations.

25           And I would submit that that's made purposely vague

43

1   by FIMBank.  And that goes back to what my colleague Mr. Wray

2   said about using -- relying on these Google databases to find

3   the addresses of corporate offices.

4           Not reliable information.  But they had used it to

5   intentionally make it look confusing and make it look like

6   somebody did something sneaky because these Google databases

7   don't show a correct address for the various entities.

8           Here, as Mr. Saevski has pointed out in his

9   declaration and it is borne out in some of their documents;

10  like the charter party for the NIKA.

11          It's very clear.  What is the corporate name and

12  where are its addresses?

13          And, in fact, FIMBank found a registered office

14  addresses for both Discover and SPV SAM Eagle and SAM Panama.

15  They've written it right into their complaint as, "Here's the

16  registered office of these entities."

17          And the charter party for the NIKA -- that is one of

18  their exhibits -- it identifies who is the owner of the NIKA.

19  It expressly says, "Discover Investment Corp."  And then it

20  gives its registered office address in Monrovia, Liberia.

21          And then it says, "Who is the commercial manager for

22  this vessel?"

23          It very specifically names SAM Panama, and it give

24  the address, in Panama City, for Panama, for SAM Panama.

25          It says, "Who is the technical manager of the

44

```
 1   vessel?"
 2            It identifies Venturi.  And it gives Venturi's
 3   address, in Piraeus, Greece.
 4            My point there, your Honor, is that there should not
 5   be -- there is no confusion in anybody's mind about where the
 6   office addresses are.
 7            Instead, they've gone to great lengths to show that
 8   these databases and, in some places, the -- when addresses have
 9   changed, they've not been updated.
10            And, ultimately, what they're getting at is that the
11   vessel owner entities frequently use a care-of address to have
12   the commercial mail concerning their vessel mail care of the
13   commercial manager, SAM Panama.  And that is the same address.
14            So I would say, on Factor Number 17, yes, there is
15   evidence that the owners used care of addresses, in care of the
16   commercial manager.
17            I would also submit that, as an alter ego factor,
18   having the same address or using the same corporate office is
19   an insignificant factor that does not carry much weight.
20            If it did, companies like ExxonMobil would be in
21   trouble.  Or others, say, to think about how many ExxonMobil
22   entities all use the same address in the Woodlands, would
23   probably include a lot of -- as a matter of fact, as our
24   replient has pointed out, FIMBank itself has multiple FIMBank
25   entities that all have the same address for the same office in
```

1    Malta.

2              So it's an insignificant factor, your Honor.

3              Number 18, "Were there common business deposits?"

4              There's absolutely no evidence and no argument about

5    having common bank accounts or common deposits for these

6    companies, your Honor.

7              Number 19 asks, "Did the parent company exist solely

8    as a holding company for its subsidiaries?"

9              Really, the allegation from FIMBank is that SAM

10   Geneva -- or now they say, "SAM Panama -- is the dominant

11   mastermind; it must be a holding company for all these

12   entities."

13             But that's not true.  Discover Investment Company is

14   not a holding company for the SAM Eagle or anything else.  All

15   it does is own its one asset.  And the same is true for SPV SAM

16   Eagle.

17             So that really has to be a "no" as well for Factor

18   Number 19, your Honor.

19             I would point -- like to point out two things, in

20   trying to summarize and conclude my remarks on this, your

21   Honor.

22             Two significant points are that the chronology and

23   the time when these factors would have to be by FIMBank is

24   significant.

25             The underlying dispute is this grain delivery in

1    Egypt, by the vessel the NIKA, in the year 2018.

2             So that's the time when it's FIMBank's burden to

3    show, if they can, that they would have -- be able to pierce

4    the corporate veil, under this alter ego theory, as of the year

5    2018, that these factors were met at that time.

6             The evidence that they submitted is all over the

7    place, chronologically.  It goes back to 2014; I think some in

8    2015; some in 2016.

9             And I would ask the Court, when considering that

10   evidence and whether it -- whether it raises a reasonable

11   inference of alter ego status, in 2018 -- I would ask the Court

12   to take that into account -- that these historical documents

13   are meaningless for establishing alter ego in the year 2018.

14            Here's a significant reason why it's meaningless,

15   your Honor.  And that's that the NIKA was acquired by Discover

16   Investment Corp., in the year 2016.

17            So some of FIMBank's argument talks about this

18   vessel, when it had a former name, called the SAM Tiger, and

19   its owner was a company called SPV SAM Tiger, Inc.

20            And that has absolutely no relevance or meaning for

21   trying to pierce corporate veils between Discover Investment

22   Corp. and the other SAM entities.

23            Discover has been the owner of that vessel since the

24   year 2016.

25            I would also -- my other point, your Honor, would be

1   that I would ask that if -- FIMBank, presumably, is going to

2   talk about these factors as well, I would ask --

3           I would challenge Counsel and I would ask the Court

4   to ask Counsel to explain -- and not just talk in circles about

5   these factors -- but to identify specific bits of evidence that

6   FIMBank truly says meets any of these factors and allows one to

7   draw a reasonable inference that this factor can be met by

8   FIMBank, right now, today, to establish a reasonable inference

9   that the corporate veil should be pierced.

10          And, in particular, to ask whether any of the

11  evidence -- that Counsel will talk about and that they've

12  already asserted -- crosses this black, vertical line.

13          They've got lots of argument about the SAM side of

14  this line -- and the SAM Panama and the SAM Geneva.  There's

15  lots of argument about it.

16          But none of it, your Honor, crosses this line to

17  reach into Discover Investment Corp. or the M/V NIKA.  There's

18  not a connection between them.

19          And that's why I submit, your Honor, that FIMBank

20  cannot meet its burden of showing why this attachment should be

21  held in place today to deprive SPV SAM Eagle of the use of its

22  property, the Sam Eagle.

23          **THE COURT:**  Thank you.

24          **MR. WRAY:**  Okay, your Honor --

25          **THE COURT:**  Mister --

48

1          **MR. WRAY:**  We address the final part of the evidence

2   (indisc.).

3          **THE COURT:**  Wait just a minute.

4          What are you going to address?

5          **MR. WRAY:**  The second part of the (indisc.).

6          **THE COURT:**  Which is -- you have five minutes.

7          **MR. WRAY:**  Sure.  I'll be very brief.

8          Not only does FIMBank have to address (indisc.) alter

9   ego, they have to show it was used for fraud.

10          The only fraud they point to is a document that was

11   collateral for loan arbitration, saying, "Discover, don't sell

12   your vessels until June -- before June 21, 2019."

13          Discover sold their vessel on June 24th.

14          **THE COURT:**  I understand that.

15          **MR. WRAY:**  They adhered to the terms of the

16   agreement.  There's no evidence of fraud.

17          **THE COURT:**  I understand that.  I understand that.

18          **MR. WRAY:**  (Indisc.) establish (indisc.) alter ego

19   factors.  Without the fraud, they have nothing.

20          **THE COURT:**  All right.

21          Mr. Floyd, are you going to --

22          **MR. FLOYD:**  Absolutely, your Honor.  And I will try

23   to be as brief as possible here.  Just got my notes down there.

24          And I thought, a good spot to start -- because Mr.

25   Hart spoke an awful lot about the ship management agreement.

1          And it is a standard form, prepared by BIMCO, which

2    is a maritime organization, while regarding everything.  And

3    they publish an awful lot of standard forms, for everything

4    from charter parties, voyage charters, time charters, salvage

5    agreements -- all sorts of standard forms.

6          Standard forms are pretty common in the maritime

7    industry.  And then bulk them on up with the rider clauses.

8          But Docket Number 27 tack 3 -- and I'm looking at

9    page 8 of 81, in that entry.  Big entry is Mr. Saevski's

10   declaration.  And I'm looking at the shipman agreement between

11   Discover and SAM Shipping Management S.A.

12         There's a really interesting thing that I think goes

13   to an awful lot of the 19 or so non-exclusive factors that Mr.

14   Hart just pointed to.

15         If you go to Box 22, of the shipman agreement -- Box

16   22 and 23 -- those are the notice clause provisions, saying,

17   "To whom does notice go by one party to the agreement when it

18   has something to tell to the other party to the agreement?"

19         So here, meaning, if Discover needs to say some to

20   SAM Shipping Management or SAM Shipping Management needs to say

21   something to Discover, where does that communication go?

22         Box 22:  Really interesting.  Notices to Discover

23   Investment Corp., they go care of SAM Shipping Management S.A.

24   and care of Venturi Fleet Management S.A.

25         They don't go to Discover Investment Corp.  That's

1   because Discover Investment Corp., by all indications presently

2   known, is a Liberian entity with -- I don't even need to look

3   at this -- it's registered address at 80 Broad Street,

4   Monrovia, Liberia, just like tens of thousands of other single-

5   asset vessel owning companies.

6          80 Broad Street, Monrovia, Liberia.  I'm sure every

7   shipping attorney in the room here has written that address

8   several hundred times in their careers.

9          So communications go to the manager, even if they're

10  coming from the manager, makes one logically wonder, "What is

11  the real purpose, if any, of Discover, other than serving as a

12  shell to be the registered owner of a vessel that can then be

13  easily transferred when there's claims against the vessel?"

14         That was point of theirs.  Another cleanup topic --

15  and, certainly, I'll walk on through, briefly, the 19 points or

16  so.  And I've summarized my views on those.

17         But a common (indisc.) was made, saying that FIMBank

18  or its attorneys filed this complaint and somehow knew that SAM

19  Shipping Asset Management, in Geneva -- which I now refer to

20  as, "Old Sam; Old Sam Geneva" -- that it had been -- had its

21  name changed to company, *General du Maritime le Commerce* S.A.

22         And then company a Maritime -- or whatever it's

23  called in French -- went into liquidation.

24         But, magically, a new company, also called Shipping

25  Asset Management, paren, SAM, close paren, S.A., was created

51

1   shortly before that, in Panama.

2           And so it just sprung right back into existence.  I

3   personally feel zero guilt for not having seen that.  It's

4   rather confusing to catch it.

5           And I think it was a late night, around midnight --

6   well after the complaint had been filed and well after my

7   adversaries had filed their motion to vacate the attachment --

8   flipping around and saw, wow, there's another company with

9   precisely the same name, located in Panama.  What's the story

10  here?  What's going on?  Why would anybody do that?

11          And then you dig a bit deeper, and you look at

12  mortgages -- and these are all in the declaration of Mr.

13  Zadkovich, which we put it in opposition -- you look at

14  mortgages and there is a mortgage, from 2016 -- the mortgage-

15  related document.  I forget whether it's an amendment or the

16  first mortgage or something else.

17          But there's a document, from late-2016.  So about a

18  year after the name -- name change, and after the liquidation

19  in Switzerland, where Mr. Saevski signs off on that mortgage

20  document.

21          And what's contained in the address information being

22  given to the bank, which was Credit Suisse, for notice to go to

23  the mortgagor, says SAM -- or Shipping Asset Management, SAM,

24  S.A., on route to somebody in Geneva, Switzerland.  It's the

25  old company no longer existing.

1          So, look, I fell for it; the bank fell for that; Mr.

2     Saevski doesn't say anything in his declaration here about

3     that -- certainly that he would sign off on that makes me

4     wonder about his declaration and a point of discovery that I

5     would certainly hope to take and I'll go anywhere to get that

6     done -- would be to take a deposition of Mr. Saevski.

7          But that's a very interesting factor right there.

8     I've never heard of a company that changes its name,

9     liquidates, but has a doppelganger in another country, ready to

10    step into their shoes and be used as notice address for the

11    bank, in a mortgage, surprising.

12         I would -- continuing to move on -- gentlemen, would

13    you mind if I moved to this mic?

14         **MR. SPEAKER:**  Fine with me.  It's all right.

15         **MR. FLOYD:**  Andy, could you give me a hand?

16         **MR. NASH:**  Yeah.

17         **MR. FLOYD:**  That would be great.  Thank you.

18         Moving on through these quickly, I know -- and not

19    surprisingly -- the attorneys -- Counsel for SAM Eagle -- SPV

20    SAM Eagle have said no on each of these.

21         I think that we would say yes on nearly every single

22    one.  And on a few, it might be, you know, to be determined

23    during discovery; just be realistic there.

24         But, "Is there common stock ownership?

25         Well, these are all, as we can tell, closely held

1    companies.  They're not publicly traded.  They're not owned by

2    even five or six different companies being involved.

3              There's going to be single owners all the way up the

4    chain, until you get that ultimate beneficial owner, at the

5    very top.

6              But the fact that, as shown in Exhibit L, to Mr.

7    Zadkovich's declaration -- the fact that Steamship Mutual

8    issued renewal numbers for two years in a row, for the vessels

9    in the SAM Shipping fleet, and those renewal numbers were

10   sequential when it went to SAM-animal-this, SAM-animal-that,

11   SAM-animal-bird, NIKA, and then some other ships -- in fact, to

12   the SAM-animals, they were sequential.

13             And we (indisc.), supporting the maritime industry,

14   we have a good understanding of how P&I Clubs work, sequential

15   numbers would not get issued unless those vessel-owning

16   entities under the same beneficial ownership.

17             Likewise, even after the former SAM TIGER became

18   known as the NIKA -- now it's known as the NORD -- still

19   prominently emblazing painted on its hull, and sailing around

20   the world for a good number of years -- was SAM Shipping, in

21   big, big letters.

22             I'm quite certain that discovery would show that

23   there is common stock ownership at the UBO -- ultimate

24   beneficial ownership level -- amongst all these entities, and

25   certainly including in SPV SAM Eagle and Discover.

1          With that said, the reality is ships -- part of the

2    assets.  Nobody has come forward and identified a single

3    employee or a single operating address of any of these vessel

4    owning companies.

5          There is registered addresses.  There's 80 Broad

6    Street, over in Monrovia; and there's an address at High Tech

7    Tower, in Panama City.

8          But those are -- 80 Broad Street is where the

9    Liberian corporate registry is located.  That's its

10   headquarters.  And the High Tech Tower address is a law firm,

11   Ballard and Ballard, in Panama City.

12         I don't think anybody's actually chartering ships --

13   I can say, with certainty, regarding 80 Broad Street.  And I

14   don't think that's happening in High Tech either.

15         I won't go through and change any of these, where it

16   says no or yes or anything like that.

17         The common stock ownership, likewise, somewhere down

18   there, there was the issue of addresses.

19         Common directors and officers:  These types of

20   companies -- which are closely held companies set up in

21   offshore jurisdictions to own single assets -- have nominee

22   directors and nominee officers.

23         The real question there is, "Who are the employees?

24   Who is running things day to day?"

25         And there is commonality there.  That commonality is

55

1   the shipping management company.  It does it for all of them.

2   And that's not even in dispute.

3           Whether it's old SAM Geneva, new SAM Geneva, or SAM

4   Panama, it's the same management company.  And now, on the

5   technical management side, there's deals with (indisc.) and

6   other issues like that.

7           You have Venturi, in Greece and Piraeus, which does

8   it for all of them.  That's the director, that's the employee.

9   It's the SAM Shipping Management company -- whatever, besides

10  names being used at a given time.

11          Same thing goes for common business departments.

12  They don't have an accounting department.

13          I'll be amazed -- surprise me during discovery -- if

14  Discover Investment Corp. or SPV SAM Eagle have an accounting

15  department and an accounts receivable department, a voyage

16  chartering department, a time charter -- they're not going to

17  have it.

18          It's because everything -- all of those functions are

19  performed by the management company, be it the commercial

20  management company or the technical management company -- both

21  of which are now being run from the same address in Piraeus,

22  Greece.

23          Consolidated financial statements:  I don't know the

24  answer to that.

25          I also would be really surprised if anyone could

56

1    track down a financial statement, other than what's internal to

2    group, and probably maintained by shipping manage -- the

3    shipping management company.

4            Does the parent finance itself:  What we put in, in

5    supporting documentation, as well as, as I recall, reference in

6    the complaint, is that there had been a good deal of cross-

7    financing -- of fleet financing within this group over the

8    years.

9            What I mean by, "cross-financing," is that, an

10   ultimate beneficial owner whose single-asset companies have one

11   ship each -- Ship X, Ship Y, and Ship Z -- it goes to the bank

12   and says, "Bank, I will pledge, I will mortgage, I will do

13   this, with respect to each, X, Y, and Z, in order to get the

14   funds from you to update those ships and go purchase a new

15   vessel..." -- should have started earlier in the alphabet --

16   "...I'm going to go purchase Ship A as well."

17           That's cross-financing.  There's evidence of that

18   here.  That's the same (indisc.) financing the subsidiary.

19   Because the parent is using its assets, regardless of precise

20   entity denomination for ownership in order to fund overall

21   operation and growth.

22            "Did the parent cause the incorporation of the

23   subsidiary?"

24           I've read that a million times, and I never really

25   understand what it means.  Because, in my mind, the parent

1    company always cause incorporation of the subsidiary.  So I'll

2    take a pass on that one.  I just don't understand it.

3              "Is the subsidiary operated with grossly inadequate

4    capital?"

5              Obviously, with an awful lot of these factors, as the

6    Plaintiff here bring the claims against a group of closely-held

7    corporations and the rather murky-sometimes world of maritime

8    commerce, we're on the outside, looking in.

9              And there is always going to be a degree of informed

10   speculation.  And it is informed, of course, by experience in

11   the maritime industry.

12             But what do we know right now regarding Discover

13   Investment Corp.?

14             Well, a few days after the cessation of the

15   standstill agreement -- which Discover entered into with

16   FIMBank, in order to forestall any attempts to arrest or

17   attach, not just the NIKA, but other ships in the same or

18   associated ownership, management, or control, very important,

19   meaning the fleet.

20             Just after that protective agreement to protect the

21   whole fleet expired, Discover sold the NIKA to a company which

22   had been established -- I think it was April 24 of the same

23   year, a few weeks before -- a few weeks after the standstill

24   agreement -- and nobody's ever heard it before -- called,

25   Anchor Nautical Inc., another Liberian entity.

58

1           I haven't been able to find out anything about

2    Anchor.  Who owns it?  Where does it have offices?  Anything

3    like that.  Very, very mysterious company, created after the

4    standstill agreement was entered into.

5           And then it purchased the sole asset of Discover a

6    few days after the standstill agreement expired.

7           Well, you sell a ship.  Ships are worth a good deal

8    of money most of the time.  Generally, one expects some cash to

9    flow from that.

10          But so far, over in England, where there's a freezing

11   injunction proceeding going on, and related considerations,

12   Discover has not shown up to post any cash to have the

13   freezer -- the freezing injunction against it released.

14          It's surprising for a company that should be cash

15   rich prolong the sale of its sole asset.

16          So I think that one there is certainly supported with

17   a reasonable inference.

18          I'll try to move through this, your Honor.

19          "Does the parent pay salaries and expenses of the

20   subsidiary?"

21          Again, it goes back to the same point throughout all

22   of this.

23          We're dealing with the maritime industry, with

24   closely held companies that are operated by that same shared

25   commercial manager and same shared technical manager.

1          Those managers are the personnel; they're the

2    officers, directors, employees.  They're everything.  The only

3    other person you can find is the ultimate beneficial owner.

4          So, yes, the same people are getting paid by those

5    same other persons.

6          "Does the subsidiary receive no business except that

7    given by the parent?"

8          I think it's on page 10, of SAM Eagle's opposition

9    brief, where they basically acknowledge that.

10          I won't delay things looking on through my notes.

11    But what they said in their brief is that, that's the norm, or

12    course.  That's what a management company is there for, and so

13    there's nothing surprising or nefarious about getting business

14    from a management company.

15          Well, that may be the case.  But as of so many of

16    these things, when the management company does everything for

17    the business that's located at 80 Broad Street, Monrovia,

18    Liberia, one starts to wonder.

19          Your Honor, I don't want to drive anyone nuts here,

20    going on through.  I'll be more than happy to go through each

21    of these, or if there's other proceedings, I can hit on some --

22    highlight any of the key ones the Court's interested in.

23          **THE COURT:**  This is your hearing.  You tell me what

24    you think is important.

25          **MR. FLOYD:**  Thank you, your Honor.  I'll keep going

1    then.

2            "Does the parent use the subsidiary's property as its

3    own?"

4            That harkens back to the point already regarding

5    cross-mortgaging, cross-financing of vessels.  Take Vessel X to

6    go purchase Vessel A.  That's using property in a unique way,

7    to put it mildly.

8            "Daily operations kept separate?"

9            No.  The daily operations are fully consolidated.

10           They're all run day-to-day operations by the

11   management companies.

12           "Does the subsidiary observe corporate formalities?"

13           We already touched on the oddity regarding the

14   shipman agreement, where notices from the manager would go

15   circularly back to the manager.

16           I would propose that that certainly is not corporate

17   formality.  On money to loan, with that, there's the oddity --

18   which I just find a bit funny -- with the mortgages document.

19   Again, it's cited in the brief and next to -- not in the brief,

20   but in the declaration -- and exhibited there too.

21           There's the oddity when a mortgage document was being

22   executed, in Singapore, with respect to the M/V SAM Eagle, and

23   there needed to be a page where somebody named Dennis Magee --

24   Damien Magee needed to sign it, and sign it before a notary in

25   Singapore.

1           And the funny thing about it was, the Singaporean

2     notary identified Mr. Magee as being the authorized

3     representative, not for SPV SAM Eagle, but for SPV SAM Tiger,

4     former owner of the NIKA, just shows -- go to show how close

5     everything is amongst this -- with companies and this fleet.

6           "Were the directors of the subsidiary act in a

7     primary and independent interest of the parent?"

8           I think that's certainly the case when you have a

9     vessel manager running an entire fleet of ships, and nobody

10    knows who the single asset vessel owning companies really are,

11    other than a bunch of names at registered addresses, I don't

12    think anyone's really doing things for them.

13          "Payment or guarantee of debts of the dominating

14    corporation."

15          In our declaration, in opposition to the (indisc.)

16    motion, a number of the mortgage-related documents concern the

17    pledge of assets or the pledge of sale - pledge of shares comes

18    to mind -- by companies sitting up at the top of the group.

19          Two companies there are called, Dry Bulk Global

20    Limited and Dry Bulk Maritime Limited -- pledged their shares.

21    This was over in Hong Kong -- in a number of the SPV SAM

22    companies.

23          Likewise, there's the cross-financing of the ships.

24    So the Ship A is used to finance the purchase of Ship B.  That

25    is throughout the group.

1          "Whether the alleged dominator deals with the

2    dominating corporation at arm's length."

3          I won't go back again to the shipman agreement.  But

4    that certainly underscores that there.

5          Additionally, though, FIMBank's complaint has made

6    allegations that two vessel sales were sham sales.  That would

7    be the sale by SPV SAM Tiger -- of the Tiger -- to Discover

8    Investment Corp., where it became the NIKA.

9          And then, on the back end, much more recently, the

10   sale of the NIKA, from Discover, to Anchor Nautical, when it

11   became the NORD, were both sham sales; not arm's length sales.

12         And, in support of that, there's the declaration of

13   Mr. Pagonis that's been submitted.  He's a consultant in the

14   maritime industry.  And he took a look at information

15   concerning trade patterns and where these ships sail, whether

16   or not there was marketing for the vessel.

17         You know, if you want to sell your house, you want to

18   sell a boat, something like that, you market it.  You go out

19   into the market, you let brokers and other people know that

20   you're looking for a buyer so you get the highest possible

21   price.  He saw no indication of that.

22         And, likewise, quite notably, with respect to both of

23   those sales -- the earlier one when it became the NIKA and the

24   late one when it became the NORD -- Steamship Mutual remained

25   in P&I Club -- all of which indicate that it stayed within the

63

1   same family.

2           Generally, when a ship changes ownership, truly

3   changes ownership, the new owners would move to their preferred

4   P&I Club.  And, certainly, the sequencing of renewal numbers

5   will not stay, 1, 2, 3, 4.  If they do stay with the same club,

6   maybe it'll be 1, 2, 3, 26.

7           Same corporate office.  We haven't seen any corporate

8   office so far, other than the offices of the various SAM

9   Shipping Management companies or Shipping Asset Management SAM

10  companies, be they in Geneva or in Greece -- wherever they want

11  to bounce around to -- at the office.  There are shared

12  offices.

13          That also is a, "Yes."

14          "Common business deposits."

15          Financial information is confidential at this stage.

16  And we would most certainly need discovery to identify the

17  banking relationships.  That's one of the points that I

18  identified earlier on here.

19          And 19, Did the parent company exist solely as a

20  holding company for its subsidiaries:

21          That goes to who is the ultimate beneficial owner.

22  We're not really talking about a -- well, it goes at two

23  levels.

24          If one views the shipping management companies as

25  being the parent, then it is both -- it's running those assets

64

 1    and controlling them for the ultimate beneficial owner.

 2            I would expect that the ultimate beneficial owner is

 3    not a holding company, but an individual.  But even holding

 4    companies have individuals sitting behind if you break through

 5    the trust and find out who it is.

 6            Your Honor, that's running on through those questions

 7    there.  And then I know, at the very end there, Mr. Wray had

 8    brought up that there's the additional prong to an alter ego

 9    analysis of not just showing enough sufficient commonalities

10    amongst the group, but also proper allegations of the corporate

11    form being abused to do some wrong.

12            And to be clear, cases again and again and again have

13    said that fraud -- actual fraud is not required.  It's that the

14    language, in White Rosebay, I think was -- I think it was just

15    wrongdoing.  But fraud or other wrongdoing is commonly said.

16            But we point to here would be the standstill

17    agreement.  Quite clearly in -- I think it was April --

18    whenever it was -- late March of 2019, when Discover and

19    FIMBank entered into their so-called standstill agreement.

20            FIMBank agreed that it would not pursue arrest or

21    attachment of any ships in -- of the NIKA or of any ships in

22    the same or associated ownership management or control.

23            It complied with that bargain.

24            But, low and behold, during the course of that

25    standstill agreement, Anchor Nautical was established down in

1    Liberia.

2              And as soon as the agreement came to its end, the so-

3    called --

4              **THE COURT:**  So how does that end up being fraud?

5              **MR. FLOYD:**  Your Honor, it doesn't need to be fraud.

6    Other wrongdoing --

7              **THE COURT:**  Why is it wrongdoing --

8              **MR. FLOYD:**  -- is sufficient.

9              **THE COURT:**  -- if they create a company that -- if

10   somebody creates a company and then, after the agreement has

11   completely expired, they sell their vessel to that entity?

12             **MR. FLOYD:**  To an entity within the same family, I

13   think that that is wrongful because it's misleading to the

14   world.  If --

15             **THE COURT:**  Okay, I need to take a break.  I've got

16   to sign a search warrant.  And then, when we come back, I'm

17   going to give both sides ten minutes, period.

18             You make all your arguments then.

19             **THE MARSHAL:**  All rise.

20        **(Court is in recess from 4:17 to 4:32 p.m.)**

21             **THE COURT:**  All right.  We're back on the record on

22   the FIMBank case, 19-cv-264.

23             Do you want to finish up?

24             **MR. FLOYD:**  Yes, your Honor.  I can finish off in one

25   minute.  My -- the last comment that I was on there the Court

1   had asked about the transfer of the NIKA from Discover to

2   anchor, and on that point, in our brief from the *White*

3   *Rosebud* -- the *White Rosebay* case, we cited page six of that

4   argument, a quotation from that, that all that's required --

5   it's not fraud, but all that's required is an element of

6   injustice or fundamental unfairness, and that case also noted

7   that the shifting of assets could be an indicia of abuse of the

8   corporate form.  That's what we're getting at here, your Honor.

9   The concern, the fundamental concern, is that Discover sold its

10  sole asset, proceeds would ordinarily flow from such a sale,

11  but the appearances do seem to be that Discover is not exactly

12  cash rich at the moment and perhaps without assets, and that

13  that transfer has been from a known entity within the same

14  group, apparently to what was an unknown entity within the

15  group.  And I would also disagree; I know there were comments

16  beforehand that one can go and arrest a ship anywhere around

17  the world.  It's not nearly that easy.  Ships can run.  Chasing

18  a ship around the world, they're peripatetic assets.  You need

19  to find it; then you also have to comply with the local law

20  where you find it.  And that law varies greatly.  So, it's not

21  as easy as one might say.  On top of all of that, even if there

22  were a possibility of seizing the NIKA or now the NORD

23  someplace else in the world, it has zero bearing legally on

24  this proceeding here now.

25                   Your Honor, those were all the comments that I had in

 1   rebuttal there.  I can certainly sum up when the Court would

 2   like.

 3          **THE COURT:**  Mr. Ray?  No, Mr. --

 4          **MR. HART:**  Your Honor --

 5          **THE COURT:**  Mr. Hart, right?

 6          **MR. HART:**  Yes.  Yes, your Honor.  Mr. Hart speaking.

 7   I would like to make three points that I intend to and believe

 8   I can make them briefly; three points in response to counsel's

 9   remarks.

10          First, in counsel's argument just now to the last

11   bit, particularly regarding the alter ego factors and the two

12   posters that counsel just went through, I would like to point

13   out that none of those arguments and none of that evidence

14   crossed this black vertical line on our chart to connect

15   Discover Investment Corporation.  I was listening carefully for

16   it, and I heard none --

17          **THE COURT:**  I don't think -- I think you would agree

18   that it didn't, but I think what he mentioned earlier was

19   that's what he needs the discovery for.  You have -- is that

20   right?

21          **MR. FLOYD:**  Yes, your Honor.  It's -- there's

22   potential cross with respect to the management company, but

23   ultimately with -- what matters is what's not shown on that

24   chart, who sits above the two sole private investors.  That's

25   where that TB (indisc.) --

1          **THE COURT:**  That's what you're talking about in terms

2    of the beneficial owner.

3          **MR. FLOYD:**  Yes, your Honor.

4          **THE COURT:**  Okay.  Go ahead.

5          **MR. HART:**  In terms of the alter ego analysis, your

6    Honor, I'm simply pointing out that none of the evidence or

7    arguments establishes or allows one to draw a reasonable

8    inference today that there is a connection to Discover

9    Investment Corp., that the corporate form -- that any of

10   these -- this evidence was used to abuse the corporate form of

11   Discover Investment Corp. --

12         **THE COURT:**  Okay.  Now --

13         **MR. HART:**  -- it's simply not there.

14         **THE COURT:**  -- you said something a minute ago about

15   it's too late to order discovery because we're in this hearing

16   now.  Tell me exactly what you were talking about.

17         **MR. HART:**  I'm talking about the fact that in this --

18   to attach property under Rule (b) is not intended to be --

19   under the Admiralty Rules, the Federal Rules of Civil

20   Procedure, is not intended to be a procedural tool that opens

21   the door to discovery.  It's instead -- Rule (b) itself, the

22   attachment of property, is an extraordinary remedy.

23         **THE COURT:**  I understand that.

24         **MR. HART:**  And, then, so it requires a heightened

25   standard.  It's not open-ended discovery.

1          And the second point is that the alter ego, veil

2     piercing theory, is itself, as the case law says, an

3     exceptional remedy; exceptional thing to do.

4          **THE COURT:**  Uh-huh.

5          **MR. HART:**  And it's not the rule, it's not the norm;

6     it's an exception.

7          **THE COURT:**  But are you telling me that I cannot

8     order discovery on this issue if it appears that discovery

9     would be warranted?

10         **MR. HART:**  Not at all.  Not at all.  That's not what

11    I'm suggesting, your Honor.

12         **THE COURT:**  Okay.

13         **MR. HART:**  Certainly we understand the Court has the

14    authority and the discretion to order discovery.  What I am

15    doing and what we are doing is asking that the Court not allow

16    that discovery for these reasons.

17         **THE COURT:**  Okay.

18         **MR. HART:**  But -- for all those reasons.

19         **THE COURT:**  I understand.

20         **MR. HART:**  But that if that discovery is allowed,

21    then we'll -- then we would very much ask the Court to require

22    FIMBank to deposit the money to cover these custodial expenses

23    to hold the vessel in custody while they conduct their

24    discovery, which essentially would be a fishing expedition for

25    them to try to find out what if they might find some

1    information about Discover.

2            I'd also like to point out that -- I don't want to

3    forget this point, your Honor, which I think is an important

4    one.  So much, in fact, nearly all, of their alter ego theory

5    relies on the fact that there is a common commercial manager

6    for the two vessels.

7            **THE COURT:**  I heard the argument about that.  I don't

8    need it repeated.  Was there something else you wanted to say?

9            **MR. HART:**  I just wanted to point out how that's so

10   much like -- it's not unlike an office building management

11   contract, a company like CBRE that manages lots of office

12   buildings, and there's a building management agreement with

13   CBRE, and CBRE conducts all the business of that building, goes

14   out and gets tenants, collects rents, sign leases, and they

15   maintain the building, they pay all the expenses for the

16   building.  They are required to go and deal with the insurance

17   for the building.  They, basically -- CBRE runs all the

18   business of the building.  CBRE also does that for lots of

19   other buildings.  And each of the -- many of the buildings are

20   owned by different owners.  So, the fact that lots of different

21   buildings and lots of different real property owners contract

22   with CBRE to manage their asset, that does not mean that all

23   those owners are alter egos of each other --

24           **THE COURT:**  But how did they all get the name SAM?

25           **MR. HART:**  -- or that the building --

1          **THE COURT:**  How did they all get the name SAM?

2          **MR. HART:**  Well, actually, your Honor, they don't.

3     Discover Investment Corp. does not have the name SAM, and MV

4     NIKA does not have the name SAM.  They don't all have the name

5     SAM.  But over here on the other side, SPV SAM Eagle, the SAM

6     actually, I think, originally came from Shipping Asset

7     Management.

8          **THE COURT:**  But doesn't the NIKA have the name SAM,

9     or do I have that wrong?  Now.

10         **MR. HART:**  That is --

11         **THE COURT:**  After being sold.  SAM NORD or something?

12     Or did I get that wrong?

13         **MR. HART:**  It is not --

14         **MR. FLOYD:**  No, now it is NORD.  Sorry.

15         **THE COURT:**  Ah.

16         **MR. HART:**  There is no SAM in its name now, your

17     Honor.

18         **THE COURT:**  Okay.  All right.  Was there when it was

19     sold?

20         **MR. HART:**  No, there was not.

21         **THE COURT:**  Okay.  All right.  Then, I was wrong

22     about that.  I'm sorry.  Go ahead.

23         **MR. FLOYD:**  It was the SAM -- it was the SAM Tiger

24     (phonetic) originally up until 2016.

25         **THE COURT:**  Okay.  Yeah.  All right.  That's where

1    the SAM came in.  Okay.

2           **MR. HART:**  But that was two years before this and

3    before it was sold to Discover Investment Corp.

4           **THE COURT:**  Go ahead.

5           **MR. HART:**  My last point, your Honor --

6           **THE COURT:**  Yes, sir.

7           **MR. HART:**  -- is that -- to point out that none of

8    this -- these documents and alter ego evidence that counsel was

9    talking about, none of that goes to the element of perpetrating

10   a fraud.  None of it allows one to draw a reasonable inference

11   that the corporate form of Discover Investment Corp. was abused

12   in order to perpetrate a fraud or a wrongdoing or an injustice

13   to FIMBank in connection with the transaction at issue.  And

14   that's what the case law would require for piercing the

15   corporate veil, and that's what they don't have any evidence

16   of, and the transaction at issue here is the delivery of grain

17   by the NIKA in Egypt, and none of this talk or documents

18   establishes a reasonable inference of any fraud or wrongdoing

19   in connection with the delivery of the grain by the NIKA.

20          **THE COURT:**  Thank you.

21          **MR. HART:**  Thank you, your Honor.

22          **THE COURT:**  You've got a couple of minutes, Mr. Nash.

23          **MR. FLOYD:**  I'll be extremely quick, your Honor.

24   Regarding the name SAM being associated with the NIKA, when it

25   was still the NIKA and well after for a long period of time

1    following that sale, that's probably coming from the photograph

2    that shows a vessel that has NIKA up on its bow and then in

3    great big letters says SAM Shipping along the hull there.

4    That's one of the exhibits; I think it's -- well, it's one of

5    the exhibits in our brief.  I can certainly look it up if of

6    interest.

7              **THE COURT:**  Okay.

8              **MR. FLOYD:**  Regarding the analogy to CBRE and real

9    estate management companies, I think there is a huge difference

10   there, which is that, generally, so far, with technology, a

11   building stays in the same place.  And, so, if you slip and

12   fall at a building or building breaches a contract, flooding in

13   an office space, whatever it may be, the building's there.

14   Shipping is a bit different because ships sail around the

15   world, change the names, change their ownership companies; a

16   very, very difficult-to-follow industry sometimes.

17             Additionally, as to the proposition that FIMBank

18   should have to deposit some sum of money, we are -- FIMBank is

19   already making routine payments to the U.S. Marshals Service,

20   which is maintaining the custody of the vessel pursuant to this

21   Court's order.  We are making that -- in fact, it's $10,000

22   every eight days that's being paid by FIMBank, and that's, you

23   know, a substantial sum of money there.  I am unaware of any

24   proposition in the rules, in the supplemental rules, that says

25   some additional sum beyond what the marshal has asked for and

1   instructed, which is the 10,000, needs to be paid.  It sounds

2   to me like SAM Eagle is looking for some sort of -- can't even

3   call it counter security, because counter security wouldn't be

4   available here, but some sort of leverage to make life

5   difficult for FIMBank, tougher than it already has been after

6   being out of pocket $5 million or so.

7           **THE COURT:**  What were you talking about, Mr. Hart, if

8   they're already paying for it?

9           **MR. HART:**  There's -- actually, Mr. Buchanan, if you

10  don't mind, could address that.  He's got the expenses that

11  have been incurred here in this port while the vessel's been

12  under custody.  It's not only what the marshal is charging for

13  security on the ship; there's been lots of other --

14          **THE COURT:**  Okay.  Just a minute, Mr. Buchanan.

15          Did you finish?

16          **MR. FLOYD:**  I had not, your Honor.  I can finish up

17  very quickly, but why doesn't Mr. Buchanan go.  I wasn't clear,

18  though, what Mr. Buchanan states on to the ports?? were for.

19          **MR. HART:**  SPV SAM Eagle.

20          **MR. FLOYD:**  Okay; because there was a reference there

21  to the port, too, that that confused me.  It was for the

22  dockage.  Well, sir, why don't you go ahead, please.

23          **MR. SPEAKER:**  Okay.  Thank you.

24          **MR. BUCHANAN:**  Your Honor, in addition to what the

25  marshal is charging, there are custodia legis expenses that

```
 1   have been --
 2              THE COURT:  So, the marshals are only talking about
 3   their fees?
 4              MR. BUCHANAN:  Yes.
 5              THE COURT:  And, then, you're -- okay.
 6              MR. BUCHANAN:  The marshal charges their fees, but
 7   the marshal isn't collecting for the custodia legis expenses
 8   that have been incurred.  For example --
 9              MR. SPEAKER:  I'm sorry, sir, but this is a separate
10   motion.  I don't think this --
11          (Talkovers)
12              MR. SPEAKER 1: And your Honor, I'm --
13              THE COURT:  No, no, no.
14              MR. SPEAKER:  Our Motion --
15              MR. HART:  Your Honor, since the court asked that
16   question of us, we'd request an opportunity to answer the
17   court's question about what we were talking about in these
18   custodial (indisc.) expenses and that's what Mr. Buchannan was
19   explaining --
20              THE COURT:  Okay.  And what you're telling me is
21   there is a bunch more, and not just the --
22              MR. BUCHANNAN:  There's roughly $200,000 has accrued
23   already in the last two months for dockets for the Port of
24   Corpus Christi, mooring expenses, pilot expenses, agency
25   expenses and tug boats when the vessel was shifted from one
```

1    dock to another and then shifted to offshore.   And anticipated

2    probably another as much as $70,000 in expense for fuel for the

3    ship and for transportation by a launch to return the ship's

4    certificates to it.   So if the court is contemplating allowing

5    discovery, SPV SAM Eagle, Inc. would request the court

6    condition that discovery on FIMBank depositing another $250,000

7    in the -- with the marshal to cover the expenses for

8    maintaining the vessel while it's under this court's custody.

9              **MR. FLOYD:**  Your Honor, I'll just note that that is

10   the subject of a separate motion.  It's already pending, I

11   don't think fully briefed at this point.  Those issues that

12   we'll debrief in connection with that, including the fact that

13   there was another arrest.  There was an arresting party for a

14   substantial chunk of time at the front end of this special --

15             **THE COURT:**  Has that been resolved?  The arresting

16   party at the front end?

17             **MR. HART:**  I understand it was revolved, your Honor.

18   I don't know much about it but I believe --

19             **THE COURT:**  Like a measly few thousand dollars

20   compared to this one, right?

21             **MR. BUCHANNAN:**  It was almost immediately resolved,

22   your Honor, the amount in dispute --

23             **THE COURT:**  I thought it would be.

24             **MR. BUCHANNAN:**  The amount in dispute was paid and

25   the vessel was released within a day or two.

1          **MR. HART:**  And as I understand it, it concerned a

2    maritime lien against this vessel, the Sam Eagle vessel.

3          **MR. BUCHANNAN:**  That's correct.

4          **MR. HART:**  It was not a --

5          **THE COURT:**  Right, right, that's right because I was

6    the one that signed the papers on that.  I do remember and

7    that's why I was so concerned when we started talking about the

8    whole alter ego thing.  Okay.  Go ahead, Mister --

9          **MR. FLOYD:**  Your Honor, I just wanted to note that

10   that's separate pending motion out there.

11         Overarching comment from me, consideration is that

12   the burden -- and it's pretty clear.  The burden on FIMBbank at

13   this state at the stage of an E4F fakitor (phonetic) motion is

14   to demonstrate that the information available, be it in the

15   complaint or in supporting documents, supports a reasonable

16   inference that it has its claim against the defendant.  And I

17   think that that has been satisfied here.  Even if there's any

18   doubt as to whether or not we've reached that reasonable

19   inference support level, I think we've certainly gotten to the

20   level that discovery, limited expedited discovery is warranted.

21   We'd look for ownership information; we'd look for information

22   about what, if any, personnel these various companies have

23   other than the management company.  We'd look for banking

24   information to see the answer to that deposit thing, the

25   ultimate beneficial owner.  Insurance.  And where the proceeds

1    went from the sale of the <u>NIKA</u> as well as some basic

2    information regarding chartering in and chartering out

3    practices.  But I think we've satisfied that burden, your

4    Honor, and certainly gotten over the hurdle of being that

5    discovery is warranted to get to the bottom of this.

6            Thank you, your Honor.

7            **THE COURT:**  Okay.  The problem is that as far as both

8    sides are concerned, there is no good news and there's no good

9    news.  And then there's more no good news.  Because if the fees

10   are as Mr. Buchanan says, then at some point, fairly soon, the

11   value of the vessel is going to be exceeded.  And I'm not the

12   one who decided how these cases are supposed to be handled.

13   But Judge Ramos assigned this case to me and as I'm sure all of

14   you understand, there are going to be these inevitable delays

15   that are going to involve my preparing a recommendation to her,

16   even though I know it's a warrant of arrest.  But to quash a

17   warrant to arrest, it's got to be done by M&R.  And then Judge

18   Ramos has to make a decision about what to do and none of that

19   -- and it might be at the end.  Let's just say I don't order

20   discovery.  It might be at the end of that period that she

21   orders discovery or she has a hearing or she decides to do that

22   prior to making any kind of a ruling on any recommendation that

23   I'm making.  I'm just pointing out the realities of how this

24   works and how it's set up and I can't make dispositive

25   decisions on this case so ....

1           And then to make matters worse for all of you, I'm

2   retiring at the end of the year and there will be somebody new

3   taking my place.  And she will automatically be substituted in

4   for anything that's going on.  So that's another person who's

5   going to have to get up to speed on the case.

6           My suggestion is -- I don't know if you can work this

7   out but it's going to -- just inevitably, it's going to take

8   some more time before this very basic decision is made.  And

9   I'm not saying that -- I'm not trying to make a threat or

10  anything like that but sometimes I think that when the lawyers

11  come here, they don't really understand the realities of what's

12  going to happen when you have all these people.  This is like

13  more than one person involved in making the decisions in this

14  case.  So I just wanted to point that out.

15          I will do my best to get something out very soon.  I

16  would -- I have to tell you, I don't know what I'm going to --

17  what kind of a decision I'm going to make.  If you want time to

18  file post-hearing briefs, that's fine with me but you've got to

19  understand what all the realities are and how long it's going

20  to take for all this to eventually be decided.  So I don't know

21  if any side feels like they need time to file additional

22  briefs.  But it seems to me that when you have these foreign

23  entities involved, these foreign shipping companies, foreign

24  owners, a different way of -- different companies that have a

25  different way of handling assets and corporate minutes and

1    corporate partnerships and eventual owners and beneficial

2    owners and that kind of thing, but you can't tell someone who

3    makes a showing that maybe there is something to this, that

4    they can't go and do some limited discovery.  If limited

5    discovery is ordered, what kind of time are you talking about

6    needing?

7            **MR. FLOYD:**  Judge, I think we can move very quickly.

8    If we were authorized to proceed with discovery today -- and

9    I'd be happy to consult with counsel on this and come back with

10   an answer quickly -- I think we could have everything --

11   Christmas might be too quick but I'd shoot for Christmas time,

12   New Years.  We'd have to have expedited responses to document

13   demands and things like that and get a deposition --

14           **THE COURT:**  But if that involves deposing people in

15   foreign countries, how do you do that expedited and how do you

16   do it at Christmas time?

17           **MR. FLOYD:**  If everybody works together.  I flew --

18   I've flown multiple times in the past week; I'm sure counsel

19   has as well.  You get where you need to be and sometimes family

20   gets to see you at Christmas.  It happened two years ago for

21   me.  We can make it happen quickly , your Honor.

22           **THE COURT:**  Okay.

23           **MR. HART:**  We would -- if that discovery were being

24   allowed, we would prefer to compress it into 30 days and get

25   all the discovery completed in 30 days.  If they want a

1   deposition, if they want documents, we would propound discovery

2   requests also.  We can envision they can -- deposing their

3   witness or witnesses as well, and should be in time to get

4   documents from them as well.  If that were going to happen,

5   your Honor.  And we would want to aim for getting that all

6   completed within 30 days.  I understand that's a tall order,

7   call for a lot of work but to all this ship under attachment

8   while they conduct discovery is a tall order.  It's a big deal.

9           **THE COURT:**  I understand that.  I understand it's

10  touch and it's tough on both sides.

11          Mr. Floyd, can you do it in 30 days?

12          **MR. FLOYD:**  What is today, the 13th?  I think to get

13  things just up and running, I'd look for -- if we're at a

14  point, your Honor, where we could all agree to limited scope

15  discovery on an expedited basis and not monkeying around with

16  any unreasonable responses to documents (indisc.) and things

17  like that and a witness was going to be made available, I'd say

18  I would propose five weeks respectfully.  It's a little bit

19  over 30 days but 35, 36.  If that's what it takes then get that

20  done.

21          **THE COURT:**  Okay.  I'm going to do this then.

22          Because I understand that the defendant is not

23  agreeing that discovery should take place but if the two of you

24  agree, the two of you agree on a period of time of five weeks

25  or whatever it is that you agree to, you could just -- all you

1   have to do is email me and I'll just issue an order to that

2   effect, or you can present a proposed order as long as it's

3   agreed to.  Otherwise I think maybe I'll -- if you're not going

4   to do that, I'll have to look at the issues.

5           **MR. FLOYD:**  In that case can we consider that, your

6   Honor?

7           **THE COURT:**  Absolutely.

8           **MR. FLOYD:**  I'm unsure of whether --

9           **THE COURT:**  Because I can't tell you.

10           **MR. FLOYD:**  What we're saying today is that we are

11   asking the court not to order--

12           **THE COURT:**  Right, I understand that.  I understand

13   that.

14           Okay.  Nobody is asking for additional briefing time

15   I take it.

16           **MR. SPEAKER:**  No, your Honor.

17           **THE COURT:**  Okay.  All right.  And I'm sorry that

18   these are the realities but they are.

19           **MR. FLOYD:**  If there were any particular issue or

20   question that the court had, that the court would like to have

21   addressed in a brief, of course we would like to do what is

22   helpful to the court.

23           **THE COURT:**  No, I think it's all in there, the

24   problem is it's just buried.

25           **(Laughter)**

1          **MR. SPEAKER:**  Your Honor, if I could just one side

2   comment?

3          **THE COURT:**  Yes, sir.

4          **MR. SPEAKER:**  I know the issue was the other motion

5   like custodial or deposit motion came on up.  We have not yet

6   responded to that.  That was filed not too long ago.  I just

7   wanted to clarify that because that is a pending open motion

8   not yet submitted to the court.

9          **THE COURT:**  Right.  But you wanted to clarify that it

10  was not yet submitted to the court?

11         **MR. SPEAKER:**  That we haven't put in our papers yet,

12  your Honor.

13         **THE COURT:**  Right, right.  And you can respond to

14  anything that Mr. Buchannan said.

15         All right.  Is there anything else?  From anybody?

16         **MR. SPEAKER:**  Thank you very much for your time

17  today, your Honor.

18         **THE COURT:**  All righty.  Thank you.

19      **(Proceeding adjourned at 4:56 p.m.)**

20      (Adjourned at 4:56 p.m.)

21      (No audible response).

22

23

24

25

## <u>CERTIFICATION</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    <u>December 12, 2019</u>

          Signed                                          Dated

*TONI HUDSON, TRANSCRIBER*