United States District Court
Southern District of Texas

**ENTERED**

May 21, 2020

David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| FIMBANK PLC, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 2:19-CV-00264 |
| | § | |
| DISCOVERY INVESTMENT CORP., *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMMENDATION

Plaintiff FIMBANK PLC initiated this action seeking an attachment of the *M/V SAM Eagle* under the court's admiralty jurisdiction, naming Defendants Discover Investment Corporation ("Discover"), SAM Shipping Management S.A. ("SAM Panama"), Shipping Asset Management S.A. ("SAM Geneva"), and SPV SAM Eagle Inc. ("SAM Eagle"). Following an *ex parte* hearing, Magistrate Judge B. Janice Ellington granted a writ of attachment against the *SAM Eagle*. (D.E. 7). SAM Eagle filed a motion to vacate the attachment under Supplemental Admiralty Rule E(4)(f) and dismiss the complaint under Federal Rules of Civil Procedure 12(b)(6) and 12(c) (D.E. 17), along with a second motion to dismiss under Rules 12(b)(2), (4), and (5) (D.E. 19), to which FIMBANK has responded (D.E. 21, 25). On November 15, 2019, Judge Ellington ordered expedited jurisdictional discovery regarding FIMBANK's allegation that the defendants should be treated as alter egos. (D.E. 39). Following the close of this limited discovery, both FIMBANK and SAM Eagle filed various supplemental briefs. (D.E. 73, 75, 105, 106, 108, 133). For the reasons discussed further below, it is

recommended that both of SAM Eagle's motions (D.E. 17, 19) be DENIED and that the Court find that jurisdiction is proper because FIMBANK has shown reasonable grounds to maintain the attachment.

## I. BACKGROUND

### a. FIMBANK's Allegations

In the complaint, FIMBANK alleges that it provided banking facilities to AOS Trading DMCC and AOS International SA (collectively, "AOS") to finance the purchase of presold grain for shipment to Egypt.  (D.E. 1 at 3).  In March 2018, AOS sought to finance the purchase of 51,300 metric tons of wheat to be shipped on the *M/V Nika*,[1] at the time owned by Discover.  (*Id.*).  Credit Suisse sent FIMBANK 61 bills of lading regarding the financed wheat, and FIMBANK remitted $10,593,156 on behalf of AOS. (*Id.* at 3-4).  FIMBANK retained the bills of lading as security for the advance.  (*Id.* at 4).

The *Nika* carried the wheat to Egypt, where it was discharged.  (*Id.*).  FIMBANK sent sets of bills of lading to the various buyers and financial institutions for collection. In June 2018, FIMBANK was informed that all of the wheat had been collected from the warehouse, but it was still awaiting payment on 17,300 metric tons of wheat.  One financial institution returned the bills of lading for all 17,300 missing metric tons. FIMBANK alleges that the missing wheat was mis-delivered by the *Nika* and that Discover is liable for the resulting loss.  (*Id.*).

---

[1] The vessel known as the *Nika* at the time of the grain shipment was previously known as the *SAM Tiger* and is now named the *Nord*.  This memorandum primarily refers to the ship as the *Nika* because that was its name at the time of the underlying dispute, although the other names are used when appropriate.

In February 2019, FIMBANK contacted Discover to inform it that FIMBANK was the lawful holder of the bills of lading and that it understood the wheat to have been discharged to a third-party without proper presentation of the bills of lading.  (*Id.* at 5). In March 2019, FIMBANK and Discover entered a standstill agreement in effect until June 21, 2019, in which they agreed that: (1) Discover would not sell or transfer the *Nika*; (2) FIMBANK would not seek to attach the *Nika* or any sister vessels; (3) any time limits were extended until July 1, 2019; and (4) the bills of lading were "governed by English law and claims thereunder are to be pursued in arbitration in London."  (*Id.*).

On June 26, 2019, FIMBANK sent a notice of arbitration to Discover and, the following day, requested security for its claims in the amount of $4,900,000.  (*Id.* at 8). Discover did not respond to the request for security, so FIMBANK investigated the *Nika*'s status and found that it had been renamed the *M/V Nord* and that ownership had changed to Anchor Nautical SA.  The relevant registry entry had changed on June 24, 2019, three days after the end of the standstill agreement.  (*Id.*).  In July 2019, Discover responded that the notice of arbitration was defective, but eventually appointed an arbitrator, contending that they were doing so without prejudice to the assertion that the notice was defective.  (*Id.* at 8-9).  FIMBANK sought a freezing injunction in English Court, which was granted on August 22, 2019.  (*Id.* at 9).

FIMBANK further alleges that Discover, SAM Panama, SAM Geneva, and SAM Eagle should be treated as alter ego entities because they have blurred the lines between separate existences and have abused the corporate form in order to perpetrate a fraud, injustice, or other wrongdoing.  (*Id.* at 9-10).  In support, FIMBANK alleges that the

3

defendants: (1) share overlapping ownership, personnel and officers; (2) have common office space and addresses; and (3) are otherwise operated in a way that suggests an alter ego relationship. (*Id.* at 10-15).

As to abuse of the corporate form, FIMBANK alleges that the *Nika*'s sale and reemergence as the *Nord* was a sham transaction intended only to frustrate the interests of FIMBANK as creditor. (*Id.* at 15). FIMBANK raises multiple grounds for this allegation, including that: (1) SAM Asset Management (SAM) S.A. continued to be the vessel's commercial operator; (2) the vessel was not circulated in the market as being available for sale; (3) the *Nord*'s trading pattern remains the same as before the sale; (4) the *Nord* retains the same protection and indemnity insurance club ("P&I Club") as it had before the sale and as all other SAM vessels; (5) the flag remains the same; (6) Discover was a single-vessel-owning company that sold its only asset despite the pendency of claims against it; and (7) Discover sold the vessel only three days after the expiration of the grace period, but it would have been in violation of the standstill agreement if it took any actions towards selling the vessel during the grace period. (*Id.* at 15-17).

As to the requirements to obtain an attachment against the *SAM Eagle* under Rule B of the Supplemental Rules for Admiralty or Maritime Claims, FIMBANK alleged that none of the alter ego defendants could be found in this district, but that the *SAM Eagle*, their asset, could be. (*Id.* at 17-18).

FIMBANK attached a declaration from their general counsel, Andrea Batelli, who stated that he read the complaint and "[knew] the contents therefore and that the same are

4

true to my own knowledge, except as to matters stated to be alleged on information and belief, and as to those matters I believe them to be true." (*Id.* at 22).

### b. Relevant Procedural History

Following an *ex parte* hearing on September 13, 2019, Magistrate Judge Ellington issued an order for writ of attachment against the *M/V SAM Eagle*. (D.E. 7).

On September 26, 2019, SAM Eagle entered a restricted appearance pursuant to Rule E(8) of the Supplemental Rules for Admiralty or Maritime Claims and filed its first "Motion to Vacate Attachment and Motion to Dismiss." (D.E. 17). SAM Eagle indicated that the motion was brought to vacate the attachment under Supplemental Admiralty Rule E(4)(f) and to dismiss under Fed. R. Civ. P. 12(b)(6) and 12(c).[2] (*Id.* at 1). On October 4, 2019, subject to the same restricted appearance, SAM Eagle filed a "Motion to Dismiss" under Fed. R. Civ. P. 12(b)(2), (4) and (5). (D.E. 19). Response and reply briefs followed each motion. (D.E. 21, 25, 27, 37).

On November 13, 2019, the court held a hearing on the motion to vacate the attachment. In the subsequent order for expedited jurisdictional discovery, Magistrate Judge Ellington noted that FIMBANK's claims against the *M/V SAM Eagle* rested entirely on the alter ego allegations and concluded that FIMBANK had alleged sufficient facts that, if substantiated, would support the court's *quasi in rem* jurisdiction over each of the defendants as alter egos of SAM Eagle. (D.E. 39 at 1). However, because the alter ego allegations implicated the court's jurisdiction, Judge Ellington ordered limited

---

[2] Although SAM Eagle purportedly filed the motion in part under Rule 12(c), that designation was improper. Rule 12(c) only applies "[a]fter the pleadings are closed," which was not the case when SAM Eagle filed the first motion.

discovery to determine whether this court may properly exercise admiralty jurisdiction. (*Id.* at 1-2).

In January 2020, following the completion of limited discovery, the parties filed their supplemental briefs.  (D.E. 73, 75, 105).  Finally, SAM Eagle filed a supplemental brief regarding the English High Court's February 5, 2020, discharge of the freezing order discussed in the complaint.  (D.E. 106).  This was, naturally, followed by a response and a reply.  (D.E. 108, 133).

## II.   DISCUSSION

### a.  Standards of Review

#### i.   *Rule 12(b)(6)*

Rule 12(b)(6) provides for dismissal of an action for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In determining whether to grant a motion to dismiss, the court must not go outside the pleadings and must accept all well-pleaded facts as true, looking at them in the light most favorable to the plaintiff.  *Scanlan v. Texas A&M University*, 343 F.3d 533, 536 (5th Cir. 2003).

A pleading must include a short and plain statement of the claim showing that the pleader is entitled to relief and giving the defendant fair notice of what the claim is.  Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A complaint attacked by a Rule 12(b)(6) motion does not need detailed factual allegations, but the plaintiff must nonetheless provide more than merely labels and conclusions, and a "formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  The factual allegations in the complaint are assumed to be true, even if

6

unlikely, but the allegations must "raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." *Id.* at 555, 570. A claim has facial plausibility where the factual allegations allow the court to reasonably infer that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Facts that are merely consistent with a defendant's liability are insufficient. *Id.*

ii. *Supplemental Admiralty Rule E(4)(f)*

Whenever property is arrested or attached, any party claiming an interest in the property is entitled to a prompt hearing at which the plaintiff must show why the arrest or attachment should not be vacated or other relief granted. Fed. R. Civ. P. Supp. Adm. R. E(4)(f). In addition to meeting the filing and service requirements of Supplemental Rules B and E, the plaintiff must show that: (1) it has a valid *prima facie* admiralty claim against the defendant; (2) the defendant cannot be found within the district; (3) the defendant's property may be found within the district; and (4) there is no statutory or maritime law bar to the attachment. *Naftomar Shipping and Trading Co. v. KMA Intern. S.A.*, 2011 WL 888951 at *2 (S.D. Tex. Mar. 10, 2011).

Courts disagree whether the standard for determining whether a plaintiff has a valid *prima facie* admiralty claim is merely a pleading standard or whether it includes an evidentiary requirement that there be reasonable grounds to support the attachment. *Id.* "Reasonable grounds" has been compared to probable cause. *Id.* In *Naftomar*, a judge of this court applied the reasonable grounds/probable cause standard, determining that the plaintiff has the burden to establish probable cause for the arrest. *Id.* at *3. At a Rule E(4)(f) hearing, the court does not definitively resolve factual disputes, but rather

7

determines whether it is likely that the alleged facts are true. *Id.*

While similar, a Rule 12 motion to dismiss and a Rule E(4)(f) motion to vacate are not precise equivalents. *White Rosebay Shipping S.A. v. HNA Group Co. Ltd.*, 2013 WL 441014 at *3 (S.D. Tex. Feb. 5, 2013). While a court may not go outside the pleadings in considering a Rule 12(b)(6) motion, a Rule E(4) motion "permits the Court to look beyond the complaint, consider evidentiary submissions by the parties, and to hold a hearing, if requested." *Id.* Thus, even if the plaintiff's factual allegations state a plausible maritime attachment claim under Rule 12, the court must additionally consider whether the complaint sets forth a valid *prima facie* admiralty claim under Rule E(4), which is a higher standard. *Id.*

**b. Verification of Complaint**

In the motion to vacate the attachment and motion to dismiss (D.E. 17), SAM Eagle argues that the complaint is not properly verified under Supplemental Admiralty Rule B(1)(a). (D.E. 17 at 19-21). In particular, SAM Eagle contends that Batelli's declaration is defective because it establishes that the majority of the allegations in the complaint are based on information and belief rather than Batelli's personal knowledge. (*Id.*). FIMBANK denies that any such personal knowledge requirement exists at the pleading stage when seeking a maritime attachment. (D.E. 21 at 28-29).

If a defendant is not found within the district when a verified complaint seeking an attachment and accompanying affidavit are filed, the complaint may contain a prayer for process to attach the defendant's personal property in the hands of garnishees named in the process. Fed. R. Civ. P. Supp. Adm. R. B(1)(a). When filing a complaint seeking

8

attachment of a vessel, the plaintiff or plaintiff's attorney must sign and file an affidavit stating that, to his knowledge or on information and belief, the defendant cannot be found in the district.  Fed. R. Civ. P. Supp. Adm. R. B(1)(b).

Here, there is no basis for SAM Eagle's challenge to the verification of the complaint.  Although SAM Eagle cites several cases in support of its argument, none of the cases involve the admiralty rules, and the majority arise in the context of a Rule 56 motion for summary judgment, which requires that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge."  Fed. R. Civ. P. 56(c)(4).  In contrast, the language in Rule B explicitly allows the plaintiff or plaintiff's attorney to rely on information and belief.  Fed. R. Civ. P. Supp. Adm. R. B(1)(b).  As a practical matter, particularly in a case involving allegations of abuse of the corporate form in order to perpetrate a fraud or injustice, the plaintiff cannot be expected to have definitive personal knowledge of the inner workings of the defendants' businesses prior to discovery.  Finally, while SAM Eagle is correct that the Batelli declaration cannot, by itself, support the attachment of the vessel, the declaration was not the sole evidence FIMBANK submitted in support of the alter ego allegations, even before the period of limited discovery. The allegations in the complaint are specific to the defendants in this case and not merely conclusory.  *See, e.g., Kola Shipping Ltd. v. Shakti Bhog Foods Ltd.*, 08-Civ-9917, 2009 WL 464202 at *2 (S.D.N.Y. Feb. 24, 2009) (stating that generalized allegations of an alter ego relationship in an attorney-verified complaint are insufficient to support an attachment).

### c. Sufficiency of Service and Second Motion to Dismiss (D.E. 18)

In the second motion to dismiss, SAM Eagle argues that service was defective as a matter of law and there is no personal jurisdiction over SAM Eagle. (D.E. 19 at 1). Specifically, SAM Eagle contends that the master of the *M/V SAM Eagle* was not authorized to receive service of process and FIMBANK has not attempted to serve SAM Eagle internationally. (*Id.* at 4, 6-7). SAM Eagle also challenges service on behalf of the other defendants. (*Id.* at 5-7).

FIMBANK responds that SAM Eagle waived these arguments by failing to raise them in the first motion under Rule 12(b). (D.E. 25 at 2-5).

When a party makes a motion under Rule 12, it must not make another motion under the same rule raising a defense or objection that was available at the time of their first motion. Fed. R. Civ. P. 12(g)(2). A party waives any defense raised under Rule 12(b)(2)-(5) by omitting it from their first Rule 12 motion. Fed. R. Civ. P. 12(h)(1)(A). The Fifth Circuit has stated that:

> The meaning of subdivision (g) is clear. If a party seeks dismissal in a pretrial motion based on any of the defenses set out in Rule 12(b), he must include in such motion any other defense or objection then available which Rule 12 permits to be raised by motion. If the party omits such defense or objection, Rule 12(g) precludes him from making a further motion seeking dismissal based on the omitted defense or objection.

*Albany Insurance Co. v. Almacenadora Somex, S.A.*, 5 F.3d 907, 909 (5th Cir. 1993).

Under Supplemental Rule E(8):

> An appearance to defend against an admiralty and maritime claim with respect to which there has issued process in rem, or process of attachment and garnishment, may be expressly restricted to the defense of such claim, and in that event is not an appearance for the purposes of any other claim

10

with respect to which such process is not available or has not been served.

Fed. R. Civ. P. Supp. Adm. R. E(8).  As explained in the advisory committee's notes, the

purpose of this rule is to ensure that:

> in order to defend against an admiralty and maritime claim with respect to which process in rem or quasi in rem has been served, the claimant or defendant [need not] subject himself personally to the jurisdiction of the court with reference to other claims with respect to which such process is not available or has not been served, especially when such other claims are nonmaritime.

Fed. R. Civ. P. Supp. Adm. R. E(8) advisory committee's note (1966).

Here, as an initial matter, SAM Eagle lacks standing to challenge the sufficiency

of service on behalf of the other defendants, which it claims no relation to.  Further,

despite citing Rules 12(b)(2) and (4) at the outset of the motion, SAM Eagle has raised no

argument under those provisions.

As to Rule 12(b)(5), SAM Eagle waived the arguments raised in its second motion

to dismiss by failing to raise them in its first motion to dismiss.  SAM Eagle explicitly

cited Rule 12(b)(6) as a basis for its first motion, which was accordingly a motion under

Rule 12 for the purposes of Rule 12(g)(2) and (h)(1)(A).  (D.E. 17 at 1).  SAM Eagle has

raised no argument that the claims raised in the second Rule 12 motion were unavailable

at the time of the first motion, nor does there appear to be a basis for such an argument.

*See* Fed. R. Civ. P. 12(g)(2).  Although SAM Eagle stated in the first Rule 12 motion that

it "reserves all its rights and defenses, including its defenses under Federal Rule of Civil

Procedure 12(b)(1) to 12(b)(6)," doing so conflicts with the express language of Rule

12(g) and (h).  (*Id.*).  None of the cases that SAM Eagle cites in support of its second

motion involve a party filing two Rule 12 motions.

Moreover, although the first Rule 12 motion was filed as part of a restricted appearance under Rule E(8), the plain language of that rule and the advisory committee notes indicate that the purpose of a restricted appearance is to protect a defendant sued in a *quasi in rem* proceeding from being subject to the court's general *in personam* jurisdiction for other non-admiralty or maritime claims.  *See* Fed. R. Civ. P. Supp. Adm. R. E(8) & advisory committee's note (1966).  Accordingly, it is unrelated to whether SAM Eagle's second motion to dismiss was properly filed because the motion arose from the same claim and service of process as the first motion to dismiss.  To the extent that SAM Eagle argues in its reply that the Court does not have *in personam* jurisdiction and that it has not waived a Rule 12(b) challenge to personal jurisdiction over such claims, that is correct.  (*See generally* D.E. 37).  However, the argument is moot because FIMBANK has not raised *in personam* claims against SAM Eagle or any other defendant, but rather explicitly relies on this Court's *quasi in rem* jurisdiction.  (*See* D.E. 1 at 19).

### d.  Decision of the English High Court

Following the completion of expedited jurisdictional discovery, SAM Eagle filed supplemental briefing regarding the English High Court's discharge of the freezing order on Discover's assets.  (D.E. 106).  SAM Eagle argues that the High Court concluded that FIMBANK could not establish a mis-delivery claim against Discover, that it knew this before filing the application for a freezing order, and that FIMBANK's lack of candor warranted lifting the freezing order.  (*Id.* at 2-8).  SAM Eagle contends that the High Court's conclusions establish facts that warrant vacating the attachment of the *M/V SAM*

12

*Eagle* because there is no valid mis-delivery claim.  (*Id.* at 8-10).  SAM Eagle argues that the decision should have preclusive effect in this case under the doctrines of collateral estoppel and comity.  (*Id.* at 10-11).

FIMBANK responds that the High Court's decision is not binding because the final decision on the merits of the mis-delivery claim will be made by the arbitrators. (D.E. 108 at 1-3).  FIMBANK contends that comity and collateral estoppel do not apply because the High Court is not the final fact-finder on the mis-delivery claim.  (*Id.* at 4-9).

Comity is the recognition of the legislative, executive, or judicial acts of another nation.  *Int'l Transactions, Ltd. v. Embotelladora Agral Regiomontana, SA de CV*, 347 F.3d 589, 593 (5th Cir. 2003).  "Under principles of international comity, a foreign court's judgment on a matter is conclusive in a federal court when," among other requirements, "the foreign judgment was rendered by a court of competent jurisdiction, which had jurisdiction over the cause and the parties."  *Id.* at 594.

Four conditions must be met in order to apply collateral estoppel or issue preclusion: (1) the issue is identical to that litigated in a prior action; (2) the issue was fully and vigorously litigated in the prior action; (3) the issue was necessary to support the judgment in the prior case; and (4) there is no special circumstance that would make it unfair to apply the doctrine.  *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 391 (5th Cir. 1998).

Here, the English High Court's decision is not preclusive of this case. FIMBANK's claim is premised on the result in arbitration, which remains pending. (D.E. 1 at 19-20).  SAM Eagle argues that "[i]t is extremely unlikely that the London

arbitration tribunal will render a fact finding contrary to the High Court." (D.E. 106 at 11). Whether likely or unlikely, SAM Eagle does not argue that the High Court's decision is binding on the arbitration tribunal. Thus, the parties do not dispute that there has not been a binding resolution of FIMBANK's underlying mis-delivery claim. Comity does not apply because the High Court did not have final jurisdiction "over the cause." *Int'l Transactions*, 347 F.3d at 594. Instead, the issue will ultimately be decided in arbitration. Similarly, collateral estoppel does not apply because the issue was not fully litigated in the High Court. *Winters*, 149 F.3d at 391. Instead, the issue will be fully litigated in the arbitration.

Further, FIMBANK argues extensively in its response that the High Court's decision was incorrect, and it submitted voluminous supplemental evidence in support. (*See* D.E. 108 at 9-28). While FIMBANK must show that it has a valid *prima facie* maritime claim in order to maintain the attachment of the *M/V SAM Eagle*, this case is not an appeal of the High Court's decision. Although the undersigned allowed the parties to supplement the record in relation to the High Court's decision, the parties have not conducted general discovery and the hundreds of pages of evidence that FIMBANK submitted regarding the merits of the maritime claim go beyond the intended reach of that order and are improper at this stage. (*See* D.E. 104).

### e. *Prima Facie* Maritime Claim

SAM Eagle argues that FIMBANK has failed to state a valid *prima facie* maritime claim because the real claim is against AOS for failing to perform under the applicable credit facility. (D.E. 17 at 6). SAM Eagle acknowledges that an ocean carrier has a duty

to properly deliver cargo, but argues that the *SAM Eagle* did not carry the grain at issue here.  (*Id.*).  SAM Eagle argues that FIMBANK was not the shipper or consignee under any bill of lading, nor was it the *Nika*'s charterer.  (*Id.* at 8-9).  Finally, SAM Eagle contends that FIMBANK has alleged no facts regarding the circumstances of the mis-delivery beyond counsel's subjective understanding that the cargo was mis-delivered. (*Id.*).

FIMBANK responds that SAM Eagle mischaracterizes the underlying dispute, which concerns the obligation of Discover to FIMBANK under the bills of lading.  (D.E. 21 at 12-13).  However, FIMBANK reiterates that the underlying dispute is not directly at issue here, but rather will be resolved in London arbitration proceedings.  (*Id.* at 14). FIMBANK asserts that the dispute is clearly a maritime claim because it is between the holder of the bills of lading for ocean carriage and the ocean carrier under those bills. (*Id.* at 14-15).  Finally, FIMBANK argues that the terms of the standstill agreement show that, while the parties disagree about Discover's liability, they agree that there is a maritime dispute.  (*Id.* at 15-16).

A maritime contract is one in which the "primary objective is to accomplish the transportation of goods by sea."  *Norfolk Southern Ry. Co. v. Kirby*, 543 U.S. 14, 24 (2004).  The sale of goods itself is not "maritime" merely because the parties agree to ship the goods by sea.  *Alphamate Commodity GMBH v. CHS Europe SA*, 627 F.3d 183, 187 (5th Cir. 2010).  There must be a substantial link between the contract and the operation of the ship, its navigation, or its management afloat.  *Id.*  A bill of lading is "a contract between the shipper and the carrier and continues to govern the rights and

obligations of the parties until delivery." *Wemhoener Pressen v. Ceres Marine Terminals, Inc.*, 5 F.3d 734, 738 (4th Cir. 1993).

An agreement to arbitrate before a maritime tribunal suggests that the parties intended to form a maritime contract and knew, or could predict with relative certainty, that the contracts were maritime in nature and could result in a Rule B attachment. *Stemcor UK Ltd. v. Sesa Int'l Ltd.*, No. 09 Civ. 1155(LBS), 2009 WL 1424008 at *3 (S.D.N.Y. May 18, 2009).

Here, based on the allegations and submitted evidence, FIMBANK has shown reasonable grounds that it has a *prima facie* maritime claim based on the mis-delivery of grain by the *Nika*. FIMBANK has alleged and submitted evidence indicating that it is the holder of the bills of lading for a cargo shipment of wheat aboard the *Nika*. (D.E. 1 at 18). The bills of lading, along with the incorporated charter party, define the conditions of carriage for the duration of the voyage. (D.E. 23-1 at 2-55). The original bills of lading were delivered to FIMBANK by Credit Suisse. (D.E. 23-2 at 2-3). FIMBANK then delivered the bills of lading at issue here to BLOM Bank in Egypt with instructions regarding when they could be released to the drawee. (D.E. 23-3 at 2-5). It is apparent from the face of the bills of lading and related documents that they are maritime contracts, which is in accordance with the typical understanding of a bill of lading, because they define the conditions of carriage and have a substantial link to the operation of the ship, its navigation, or its management afloat. *See Alphamate*, 627 F.3d at 187.

FIMBANK's mis-delivery claim arises under the terms of the bills of lading, which govern the rights and obligations of the parties until delivery. *Wemhoener*, 5 F.3d

at 738.  SAM Eagle does not dispute that an ocean carrier has a duty to properly deliver cargo, but rather contends that FIMBANK has not alleged facts to support a mis-delivery claim.  (D.E. 17 at 6-9).  Under the Rule 12(b)(6) standard, FIMBANK's allegation that the entirety of the grain was discharged before the proper recipients could obtain their share is sufficient to state a plausible mis-delivery claim.  (*See* D.E. 1 at 3-4).  Implicit in this allegation is that the cargo was delivered to a person who was *not* entitled to possession of the goods.  *See Chilewich Partners v. M/V Alligator Fortune,*, 853 F. Supp. 744, 752 (S.D.N.Y. 1994) (discussing when a carrier is justified in making a delivery). Unlike in *Chilewich*, where the court concluded following a bench trial that no mis-delivery occurred where the carrier delivered to a party who was not in possession of an order bill for the goods, there has as yet been no evidence adduced in this case regarding the fate of the wheat or how the wrong party took possession of it.  *See id.*  Further, under the Rule E(4)(f) standard, FIMBANK's submitted evidence supports the allegations and establishes a reasonable probability that a mis-delivery occurred.  *White Rosebay*, 2013 WL 441014 at *3.  At this pre-discovery stage, SAM Eagle has not submitted any evidence to refute FIMBANK's construction of events or show that no mis-delivery occurred.

Finally, beyond the contents of the bills of lading, Discover and FIMBANK entered into an agreement to arbitrate the underlying mis-delivery dispute under the rules of the London Maritime Arbitrators Association.  (D.E. 23-4 at 4).  Although not dispositive, this agreement is a further indication of the intentions of the parties when forming the contract and suggests that they knew, or could predict with relative certainty,

that the contracts were maritime in nature. *Stemcor*, 2009 WL 1424008 at *3.

Thus, because FIMBANK's claim arises from an alleged mis-delivery under maritime contracts and the evidence submitted at this stage supports the allegations in the complaint, it has shown reasonable grounds that it has a *prima facie* maritime claim for the purposes of Rule E(4)(f). *Naftomar*, 2011 WL 888951 at *2-3. Similarly, based solely on the contents of the pleadings, the allegations in the complaint are facially plausible and give the defendants fair notice of what the claim is under the Rule 12(b)(6) standard. *Twombly*, 550 U.S. at 555, 570.

### f. Adequacy of Alter Ego Allegations

A district court has "original jurisdiction, exclusive of the courts of the States," over civil cases of admiralty or maritime jurisdiction. 28 U.S.C. § 1333(1). Under § 1333, a district court has the authority to grant attachments and arrests in actions *in rem* and to take jurisdiction over alter-ego claims related to the attached vessel. *See Flame S.A. v. Freight Bulk Pte. Ltd.*, 807 F.3d 572, 582 (4th Cir. 2015). Specifically, a federal court sitting in admiralty may "pierce the corporate veil of a corporation in order to reach the 'alter egos' of the corporate defendant directly involved," which requires a fact-specific analysis. *Talen's Landing, Inc. v. M/V Venture, II*, 656 F.2d 1157, 1160 (5th Cir. 1981). District courts apply federal common law when analyzing a corporate identity claim. *ING Bank N.V. v. M/V Portland*, IMO No. 9497854, No. 3:15-cv-00805, 2016 WL 3365426 at *6 (M.D. La. June 16, 2016).

"To state a *prima facie* claim for alter ego liability, plaintiffs must make specific factual allegations from which alter ego status can be inferred; conclusory allegations are

18

insufficient." *Naftomar,* 2011 WL 888951, at *5.   To establish an alter ego claim, a plaintiff must demonstrate: (1) that an abuse of the corporate form occurred; and (2) that this abuse promoted a fraud or injustice that injured the plaintiff.   *Bridas v. Gov't of Turkmenistan*, 447 F.3d 411, 416-17 (5th Cir. 2006).   The plaintiff must show both prongs.   *White Rosebay*, 2013 WL 441014 at *2.

The Fifth Circuit has set forth a non-exhaustive list of factors that may be considered when determining whether one company dominates and controls another for alter ego purposes.   *Oxford Capital Corp. v. United States*, 211 F.3d 280, 284 n.2 (5th Cir. 2000).   Relevant here are the following factors: (1) common stock ownership between the parent and subsidiary; (2) common officers and directors; (3) common business departments; (4) the subsidiary operated with grossly inadequate capital; (5) the subsidiary receives no business except that given by parents; (6) the parent uses the subsidiary's property as its own; and (7) the daily operations of the two corporations are not kept separate.   *Id.*   Ultimately, while these factors are an important consideration, the determination is to be based on the totality of the circumstances.   *Century Hotels v. United States*, 952 F.2d 107, 110 (5th Cir. 1992).

Here, based on the allegations and submitted evidence, FIMBANK has alleged a facially plausible alter ego claim and has shown reasonable grounds to believe that the defendants operate as alter egos of each other.   Under the Rule 12(b)(6) standard, FIMBANK sufficiently alleges that both the *SAM Eagle* and *Nika* shared common ownership and operated as a single company.   (D.E. 1 at 9-15).   The complaint does not merely contain a conclusory recitation of the alter ego standard, but rather alleges specific

19

facts that tend to show a close relationship between the various defendants.   (*See id.*);
*Twombly*, 550 U.S. at 555.   Further, FIMBANK sufficiently alleges that it suffered an
injustice as a result of Defendants' abuse of the corporate form because Discover, the
listed owner of the *Nika*, sold the vessel and now has no assets.   (*Id.* at 15-17).

Under the Rule E(4) standard, the parties submitted evidence and raised argument
on many of the potential factors to be considered when assessing alter ego allegations.
The undersigned does not address every line of argument, but rather focuses on the
evidence that most strongly supports FIMBANK's alter ego allegations.   Looking at the
totality of the circumstances, in combination with the list of factors the Fifth Circuit has
identified as potentially relevant, the undersigned finds the evidence as outlined below
particularly persuasive and, ultimately, sufficient to meet FIMBANK's burden to show
reasonable grounds at the Rule E(4)(f) stage.

The evidence indicates that multiple companies involved with the ownership and
management of various vessels are owned by the same ultimate beneficial owner, Irina
Pomelova.   As described in SAM Eagle's briefing, this multi-leveled maze of companies
includes Dry Bulk Global Limited, SAM Shipping Group Limited, Atlantic Pioneer
Shipping Company, Pacific Navigator Shipping Company, Middleton Capital Inc.,
Crosby Ventures Inc., Helen's Advisor's Inc., SAM Panama, Venturi Fleet Management,
Cornwall Maritime, Locomo, and the single-vessel-owning corporations that own the
*SAM Eagle*, *SAM Hawk*, *SAM Jaguar*, *SAM Lion*, *SAM Wolf*, and *SAM Panther*.   (*See*
D.E. 75 at 6-8).   Thus, it is undisputed that SAM Eagle and SAM Panama share the same
ultimate beneficial owner.   However, while SAM Eagle concedes that the *Nika* was

commercially managed by SAM Panama, it disputes that they share the same ultimate beneficial owner, instead contending that Discover was the 100% owner of the *Nika* and that Samed Gurbanov[3] was the 100% owner of Discover.  (*Id.* at 8-9).  Dennis Saevski, the manager of SAM Panama, Venturi, and several other Pomelova corporations, testified in a deposition that Pomelova did not make decisions regarding the *Nika*, and Gurbanov did not make decisions regarding the *SAM Eagle* or other vessels.  (D.E. 74 at 71-72[276-77]).[4]

FIMBANK disputes whether Gurbanov remains involved in the ownership of the SAM Eagle or other Pomelova companies.  (D.E. 73 at 7-12).  However, the core of the dispute between the parties is whether the *SAM Eagle* and the *Nika* merely shared SAM Panama as a commercial manager, or whether SAM Panama in reality operated both vessels as its own property for the benefit of the same ultimate beneficial owner(s). Based on the submitted evidence, FIMBANK has shown reasonable grounds of the latter. Discover did not have its own bank account.  (D.E. 74 at 21[76]).  All deposits were made into the SAM Panama account.  (*Id.*; D.E. 74-28 at 4-7).  Neither SAM Eagle nor Discover had any employees, as they contracted with their respective Pomelova-owned

---

[3] It is undisputed that Gurbanov is Pomelova's son.  (D.E. 75 at 10).  Further, it is undisputed that Gurbanov was previously involved in the ownership structure of at least some of Pomelova's companies, including the holding company for the *Nika* when it was known as the *SAM Tiger*.  (D.E. 74 at 9-10[28-29]; D.E. 74-22 at 2; D.E. 74-23 at 2). Gurbanov officially resigned as an ultimate beneficial owner in 2011 following his marriage to the president of Azerbaijan's daughter, which had created complications for the business.  (D.E. 74 at 7[17-20]).

[4] Each page of Saevski's deposition includes four mini-pages.  The number inside the brackets is to the specific mini-page.

commercial and technical management companies to pay operating expenses, including crew.  (D.E. 74 at 16[53-54], 21[76]).  Neither SAM Eagle nor Discover had its own operational address, but were both operated out of the same office in Greece.  (*Id.* at 16[53]; D.E. 74-18 at 3; D.E. 74-20 at 3).

SAM Eagle asserts that these facts represent a standard ship management arrangement where SAM Panama's management authority is governed by all-encompassing contracts between each single-vessel-owning entity and SAM Panama as the commercial manager.  (D.E. 75 at 20, 24-26, 34-35).  This could be true, but it is important to note that the analysis at the Rule E(4) stage does not definitively resolve the dispute.  *Naftomar*, 2011 WL 888951 at *3.  The evidence provided at this stage shows that the day-to-day management and financial decisions regarding the *SAM Eagle* and *Nika* were both made by Pomelova-owned companies, and all the money earned by both vessels went into Pomelova-controlled bank accounts.  Under the factors identified by the Fifth Circuit, these facts suggest that there are reasonable grounds to believe that: (1) the companies have a common ultimate beneficial owner, Pomelova; (2) the companies share common business departments because the management company is the only business department; (3) both the *SAM Eagle* and *Nika* receive no business other than that arranged by SAM Panama; (4) through its role as commercial manager, SAM Panama is able to use the vessels as its own; and (5) the management of daily operations is not kept separate.  *Oxford Capital*, 211 F.3d at 284 n.2.

Finally, as to whether the alleged abuse of the corporate form was used to commit fraud or wrongdoing, FIMBANK has shown reasonable grounds that the sale of the *Nika*

was made with the intent to shelter assets from any recovery FIMBANK may obtain for the mis-delivery.  It does not appear that Discover violated the terms of the standstill agreement by selling the *Nika* because the sale took place after the expiration of the agreement.  (D.E. 23-4 at 3).[5]  However, Discover nevertheless sold its only asset while aware of a claim pending against it, and all proceeds of the sale went directly to Gurbanov without even stopping in a corporate account.  (D.E. 74-45 at 9).  Regardless of whether the buyer was a true third-party or not,[6] the sale is relevant to the alter ego allegations.  Specifically, if Discover is an alter ego of the other defendants, assets other than the *Nika* would remain in the event that FIMBANK is entitled to recovery following arbitration.  Thus, FIMBANK has shown reasonable grounds to believe that the abuse of the corporate form, represented by the formation of the various alter ego corporations, allowed Defendants to perpetrate an injustice by liquidating Discover's assets and leaving no potential recovery should FIMBANK prevail in arbitration, despite having ample assets throughout the other alter ego corporations.

Accordingly, FIMBANK has met its burden under Rule E(4) to maintain the attachment because it has shown reasonable grounds that Defendants are alter egos of

---

[5] In the agreement, Discover agreed not to sell or otherwise transfer the vessel before June 21, 2019.  (D.E. 23-4 at 3).  However, nothing in the language of the agreement prevents Discover from negotiating a sale during the grace period, only from finalizing a sale.  The agreement includes a provision to extend the grace period, which apparently was not pursued.  (*Id.*).

[6] The vessel, now known as the *Nord*, and its new owner, Anchor Nautical, continue to contract with Venturi, a Pomelova company, for commercial and technical management.  (D.E. 74-19 at 2-3).  Gurbanov, a resident of Azerbaijan, arranged the sale to another man in Azerbaijan.  (D.E. 74 at 31-32[116-17]).

each other and have abused the corporate form to perpetrate a fraud or injustice. For the same reason, this Court's exercise of admiralty jurisdiction is proper. Finally, FIMBANK has also met its burden to avoid dismissal under Rule 12(b)(6) because the allegations in the complaint are facially plausible and give the defendants fair notice of what the claim is. *Twombly*, 550 U.S. at 555, 570.

## III. RECOMMENDATION

Accordingly, it is recommended that SAM Eagle's motion to vacate the attachment and dismiss (D.E. 17) and motion to dismiss (D.E. 19) be DENIED. Further, following the period of limited jurisdictional discovery, it is recommended that the Court find that FIMBANK has shown reasonable grounds at this stage to maintain the attachment based on an alter ego relationship between Defendants and that jurisdiction is proper.

Respectfully submitted this 21st day of May, 2020.

Julie K. Hampton
United States Magistrate Judge

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*).